THOMAS, Appellant,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY, Appellee.

[Cite as *Thomas v. Nationwide Mut. Ins. Co.*, 177 Ohio App.3d 502, 2008-Ohio-3662.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 89053.

Decided July 24, 2008.

504

William T. Wuliger, for appellant.

Rawlin, Gravens Co., L.P.A., and Ronald V. Rawlin, for appellee.

M.J. BOYLE, Judge.

{¶ 1} Plaintiff-appellant, Anne B. Thomas, appeals from an entry of the Cuyahoga County Court of Common Pleas, granting directed verdict to defendant-appellee, Nationwide Mutual Insurance Company on her claim of underinsured-motorist coverage ("UIM"). For the following reasons, we reverse and remand.

{¶ 2} This is the second time Thomas has filed an appeal in this case. See *Thomas v. Nationwide Mut. Ins. Co.*, 8th Dist. No. 86579, 2006-Ohio-4487, 2006 WL 2507570 (*"Thomas I "*). The procedural and factual background, as set forth below, remain the same. See id. at ¶ 2–6.

{¶ 3} In December 1998, Thomas was involved in a motor vehicle accident where she was rear-ended by the tortfeasor, Chris Romanin. Romanin was 16 at the time of the accident and insured under his father's insurance policy with State Farm Insurance Company. Thomas was insured by Nationwide and had an automobile policy carrying $300,000 of UIM coverage. After settling with the tortfeasor for his insurance policy limits of $100,000, Thomas presented a UIM claim to Nationwide, which it denied.

{¶ 4} On December 23, 2002, Thomas filed her complaint against Nationwide for (1) breach of contract, (2) fraud, (3) breach of fiduciary duty, (4) bad faith, and (5) declaratory judgment to establish whether she was entitled to UIM coverage under the terms of her insurance policy. Nationwide answered the complaint and denied all of Thomas's allegations relative to the coverage issue.

{¶ 5} On May 12, 2003, the trial court granted Nationwide's motion to bifurcate the proceedings. The trial court stayed Thomas's tort claims, fraud and breach of fiduciary duty, and all her claims for compensatory damages, and ordered that discovery in the case was "to proceed on the issue of coverage" alone. Just before trial, the trial court further bifurcated and stayed Thomas's claims for bad faith and punitive damages.

{¶ 6} Also before trial, both parties filed motions for summary judgment on the coverage question. The trial court denied both motions because "[w]hether plaintiff can rebut the presumption of prejudice that was created when the subrogation issues of the defendant were destroyed is a material issue of fact to be determined by the finder of fact."

{¶ 7} In May 2005, the case proceeded to a jury trial on Thomas's claims for breach of contract and declaratory judgment. The sole issue at trial was whether Thomas was entitled to UIM coverage under her policy. Nationwide claimed that Thomas was not entitled to coverage because she failed to abide by the express terms of her insurance policy. According to Nationwide, Thomas destroyed Nationwide's subrogation rights when she failed to provide proper notice that she settled with and released the tortfeasor and did not first obtain Nationwide's consent to do so.

{¶ 8} Following Thomas's case-in-chief, Nationwide moved for a directed verdict, which the trial court granted on June 1, 2005. In granting Nationwide's motion for directed verdict, the trial court provided the following judgment entry:

{¶ 9} "After reviewing current Ohio law with respect to notice and prejudice regarding subrogation rights in [UIM] claims motion of [Nationwide] for directed verdict having been timely and properly made, and the court having construed the evidence most strongly in favor of [Thomas], finding that upon any determinative issue reasonable minds could come to but one conclusion and conclusion is adverse to [Thomas], the motion is granted."

{¶ 10} The trial court denied Thomas's request for a written opinion explaining its order. Thomas appealed and presented four assignments of error for review—*the exact assignments of error that she raises in the instant appeal:*

{¶ 11} "[1] The trial court committed reversible error in denying appellant's motion for summary judgment where there was no genuine issue as to any material fact and appellant was entitled to judgment as a matter of law.

{¶ 12} "[2] The trial court committed reversible error in granting appellee's motion for a directed verdict where, after construing the evidence most strongly in appellant's favor, reasonable minds could conclude that: appellant did not materially breach the insurance contract; even if there had been a material breach, appellee waived any such breach; and that appellee either suffered no prejudice or was responsible for any act or omission that resulted in any prejudice that it may have sustained.

{¶ 13} "[3] The trial court committed reversible error in failing to construe the parties' insurance contract and define the parties' respective rights and duties, including express determinations that appellant did not breach any provisions of the policy relating to notice or written consent.

{¶ 14} "[4] The trial court committed reversible error in bifurcating the trial of this matter, curtailing appellant's discovery and limiting appellant's evidentiary presentation."

{¶ 15} In *Thomas I*, we only addressed Thomas's third assignment of error— that the trial court erred when it failed to state the basis for granting the motion for directed verdict—because we found it to be dispositive. 2006-Ohio-4487, at ¶ 6. We then dismissed the appeal for lack of a final, appealable order. We determined that the trial court's judgment granting directed verdict to Nationwide was not a final, appealable order because it did not declare the rights of the parties and was too vague to satisfy Civ.R. 50. Id. at ¶ 10–11 and 15.

{¶ 16} Upon remand (*Thomas I* was released on August 31, 2006), and upon Thomas's motion to vacate or, in the alternative, to journalize a final, appealable order, the trial court issued the following order on October 24, 2006:

{¶ 17} "Plaintiff's motion to vacate judgment or in the alternative to journalize a final appealable order, filed 09/27/2006, is granted in part.

{¶ 18} "The court hereby modifies its prior order * * * filed on 06/01/05 as follows:

{¶ 19} "Upon [Nationwide's] motion for directed verdict which was timely and properly made, and having construed the evidence most strongly in favor of [Thomas], the court finds that:

{¶ 20} "[Thomas] failed to comply with the express terms of her insurance policy requiring proper notice to the insurer of settlement of her personal injury claims and release of the tortfeasor, resulting in a determination of prejudice to the insurer pursuant to *Ferrando v. Auto–Owners Mut. Ins. Co.,* 98 Ohio St.3d 186, 2002-Ohio-7217, 781 N.E.2d 927.

{¶ 21} "Finding that upon any determinative issue reasonable minds could come to but one conclusion, the court orders that [Thomas] is not entitled to [UIM] coverage under her policy. [Nationwide's] motion for directed verdict is granted."

{¶ 22} It is from this judgment that Thomas now appeals, raising the same four assignments of error that she did in her first appeal.

{¶ 23} Before we get to the merits of this appeal, we note that the trial court's judgment upon remand, essentially adding one sentence to its entry granting directed verdict in favor of Nationwide, is marginal as to whether it adequately declares the "rights and obligations" of the parties under the insurance contract in order to be a final, appealable order.

{¶ 24} In *Am. Family Ins. Co. v. Johnson,* 8th Dist. No. 90062, 2008-Ohio-2181, 2008 WL 1974137, this court recently found that the trial court's revised judgment entry upon remand was still not a final, appealable order. Id. at ¶ 12. In the first appeal of that case, we had dismissed for lack of a final, appealable order after determining that the trial court did not adequately declare the rights and obligations of the parties under the contract. We emphasized that the trial court "did not even mention the insurance contract, let alone construe the policy at issue." Id. at ¶ 10.

{¶ 25} Upon remand, the trial court in *Am. Family* "reissued the same findings of facts and conclusions of law, but added one sentence to its judgment." Id. at ¶ 11. The trial court's one sentence simply stated that American Family "has the duty to pay for any and all damages as a result of the fire." Id. In dismissing the case again for want of a final, appealable order, we concluded that the trial court's one sentence still did not declare the rights of the parties. Id. at ¶ 12.

{¶ 26} Here, however, the trial court's revised entry, while marginal, did at least address the contract and determine that Thomas "failed to comply with the express terms of her insurance policy requiring proper notice to the insurer of

settlement * * * and release of the tortfeasor." The trial court also made a determination that Thomas's breach resulted in prejudice to Nationwide. While this finding is certainly not "textbook," it is adequate for our review.

{¶ 27} Moreover, the accident in this case took place almost ten years ago. Thomas filed her complaint for declaratory action nearly six years ago. A jury trial was held in May 2005, over three years ago. Thus, the facts in this case compel us to conclude that the trial court's entry, while a close call, did adequately declare the "rights and obligations" of the parties.

## SUMMARY JUDGMENT AFTER TRIAL ON MERITS

{¶ 28} In her first assignment of error, Thomas claims that the trial court erred when it denied her motion for summary judgment. Relying on *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 642 N.E.2d 615, Nationwide contends that Thomas cannot appeal the denial of her summary motion "at this stage of the litigation" because there was a trial on the merits.

{¶ 29} In *Balson v. Dodds* (1980), 62 Ohio St.2d 287, 16 O.O.3d 329, 405 N.E.2d 293, paragraph one of the syllabus, the Supreme Court held that "[a] trial court's denial of a motion for summary judgment is reviewable on appeal by the movant from a subsequent adverse judgment." In *Whittington*, however, the Supreme Court held that "any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting the judgment in favor of the party against whom the motion was made." 71 Ohio St.3d at 156, 642 N.E.2d 615.

{¶ 30} While the holdings in *Balson* and *Whittington* appear incongruous at first glance, the Ohio Supreme Court rejected that notion in *Whittington*. See *Evans v. Dayton Power & Light Co.*, 4th Dist. No. 03CA763, 2004-Ohio-2183, 2004 WL 928297, ¶ 16. In *Whittington*, although the Supreme Court recognized that its decision "might be cited as having some impact" on *Balson*, it distinguished it. *Whittington*, 71 Ohio St.3d at 158, 642 N.E.2d 615. The court explained, "*Balson* did not address the question whether the harmless error doctrine applies to determinations denying summary judgment motions. Further, the denial of the motion for summary judgment in *Balson* could not have been harmless since the denial was predicated upon a pure question of law, *i.e.*, the legal conclusiveness of a party's failure to timely respond to requests for admissions." Id.

{¶ 31} In deciding *Whittington*, the Supreme Court recognized the inherent injustice in denying judgment to a party whose motion for summary judgment was wrongfully denied, because that party could not immediately appeal because

orders denying summary judgment are not final, appealable orders. 71 Ohio St.3d at 157, 642 N.E.2d 615. But the court concluded that it would also be unjust to reverse a judgment in favor of the "party that was victorious at the trial, which won judgment after the evidence was more completely presented, where cross-examination played its part and where witnesses were seen and appraised." Id., citing *Home Indemn. Co. v. Reynolds & Co.* (1962), 38 Ill.App.2d 358, 187 N.E.2d 274.

{¶ 32} The Supreme Court ultimately concluded that the greater injustice would be to the party deprived of the jury verdict because "[o]therwise, a decision based on less evidence would prevail over a verdict reached on more evidence and judgment would be taken away from the victor and given to the loser despite the victor having the greater weight of evidence." Id.

{¶ 33} Therefore, while the *Whittington* decision limited the circumstances under which an appellate court can reverse a trial court's denial of a summary judgment motion, it did not completely eliminate this ability. *Evans*, 2004-Ohio-2183, 2004 WL 928297, at ¶ 16.

{¶ 34} In the case sub judice, the sole issue addressed in the parties' summary judgment motions was the same issue at trial, i.e., coverage. Because we determine that reasonable minds could reach different conclusions supporting a judgment in favor of Thomas at trial, we conclude here that even if the trial court erred in denying the earlier motion for summary judgment, that error is harmless.

{¶ 35} Accordingly, Thomas's first assignment of error is overruled.

### DIRECTED–VERDICT STANDARD

{¶ 36} In her second assignment of error, Thomas argues that the trial court erred when it granted Nationwide's motion for directed verdict because she presented sufficient evidence from which, if believed, reasonable minds could find that she did not materially breach the policy provisions, or, alternatively, if she did, Nationwide was not prejudiced by that breach.

{¶ 37} According to Civ.R. 50(A)(4), a motion for directed verdict should be granted when, after construing the evidence most strongly in favor of the party against whom the motion is directed, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party."

{¶ 38} A motion for a directed verdict tests the legal sufficiency of the evidence, presenting a question of law for review. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 219, 58 O.O.2d 424, 280 N.E.2d 896. It "does not present a question of fact or raise factual issues * * *, even though in deciding such a motion it is

necessary to review and consider the evidence." *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, paragraph one of the syllabus. Since we are presented with a question of law, we apply a de novo standard of review. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 521, 523, 668 N.E.2d 889.

{¶ 39} In *O'Day,* the Supreme Court explained that "it is uncontestably the duty of a trial court to submit an essential issue to the jury when there is sufficient evidence, if believed, relating to that issue to permit reasonable minds to reach different conclusions on that issue. * * * Conversely, it is also the duty of a trial court to withhold an essential issue from the jury when there is not sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue. * * * Naturally, if the finding on that one issue disposes of the whole case, a duty arises to grant judgment upon the whole case." 29 Ohio St.2d at 220, 58 O.O.2d 424, 280 N.E.2d 896. Thus, the question a court of appeals must consider "is whether the trial judge should have submitted the issue * * * to the jury." Id. at 221, 58 O.O.2d 424, 280 N.E.2d 896.

### THE POLICY PROVISIONS

{¶ 40} The relevant UIM provisions of Thomas's insurance policy with Nationwide sets forth the "INSURED PERSON'S DUTIES" as follows:

"1. The insured must:

   "a) submit written proof of the claim to us. It must be under oath, if required. It must include:

   "(1) the nature and extent of injuries

   "(2) treatment; and

   "(3) any other details which could affect the amount of payment.

   "b) provide all facts of the accident and the names of all witnesses

   "c) answer questions under oath as often as we require * * *.

" * * *

"3. An insured may bring legal action against the other party for bodily injury. A copy of any paper served in this action must be sent to us at once.

"4. The insured must:

   "a) obtain our written consent to:

   "(1) settle any legal action brought against any liable party; or

   "(2) release any liable party.

   "b) preserve and protect our right to subrogate against any liable party."

The policy further provides "General Policy Considerations:"

"We, you, and anyone injured by this policy must do certain things in order for the provisions of the policy to apply. The following are policy conditions:

"1. INSURED PERSONS' DUTIES

"The insured will:

"a) give us or our agent prompt notice of all losses and provide written proof of claim if required.

" * * *

"c) promptly deliver to us all papers dealing with any claims or suits.

" * * *

"5. SUBROGATION

We have the right of subrogation under the * * * coverages in this policy. This means that after paying a loss to you or others under this policy, we will have the insured's right to sue for or otherwise recover such loss from anyone else who may be liable. Also, we may require reimbursement from the insured out of any settlement or judgment that duplicates our payments. These provisions will be applied in accordance with state law."

## JURY TRIAL

{¶ 41} Thomas presented the following evidence at trial.

{¶ 42} Thomas had been a customer at Nationwide for over 20 years. Richard Prokopius had been Thomas's Nationwide agent since he began, approximately 24 years ago. Thomas explained that when she got married, she made her husband switch to Nationwide because she trusted Prokopius. She and her husband purchased life, home, and automobile insurance for four cars from Prokopius.

{¶ 43} Thomas said that she had a great relationship with Prokopius and that when she had "a problem or issue," she "pick[ed] up the phone and call[ed] him." She further explained that she always asked Prokopius what she should do, "and he tells [her] what to do, and [she] does it."

{¶ 44} On December 18, 1998, the day after she had been in the accident, Thomas called Prokopius to tell him about it and to ask him what she should do. Prokopius told her to pursue a claim through State Farm, which she did. Thomas claims that Prokopius also told her to call Nationwide's claims center to report the accident, which she claims she did, but Nationwide has no record of that call.

{¶ 45} State Farm fixed Thomas's car but would not pay her medical bills because she would not sign a release. State Farm refused to tell her what the policy limits were. Thomas said she called Prokopius to tell him of the problems she was having with State Farm. Prokopius remembered Thomas calling him at

some point to tell him that she was going to sue State Farm and he told her to "go ahead." She filed suit against the Romanins in December 2000.

{¶ 46} In December 2001, State Farm received its medical reports regarding Thomas's injuries. Immediately after, State Farm offered Thomas the policy limits of $100,000. Thomas said she was aware that if she had gone to trial, which was set in January 2002, it would cost "20,000 or more dollars."

{¶ 47} Thomas testified that she called Prokopius the day she received the offer, on December 28, 2001, and told him about it. Thomas said she told him that she "wanted to take it," but that she did not know if $100,000 would be sufficient to fully compensate her. She wanted to know if she was entitled to any money under her policy with Nationwide. She said that Prokopius told her to call "claims and open a claim," which she did.

{¶ 48} Prokopius remembered Thomas calling him in December 2001 regarding her settlement offer from State Farm. He did not recall discussing a settlement amount but said that if she had told him that the offer would not be sufficient to cover her costs, then he would have told her to call Nationwide to "turn in a claim." He also remembered Thomas calling him in January 2002 to ask him to send her a copy of her policy.

{¶ 49} Thomas called Nationwide's claim center on December 28, 2001. She said that she told someone at the claim center that she had a settlement offer from State Farm "to settle a claim for policy limits from the other person: and that [she] needed to know if [she] could take the settlement." She remembers emphasizing to the person "that [she] needed someone to get back to her right away because [she] needed to know if [she] could take the settlement." Thomas said she was told that someone would get back to her.

{¶ 50} Nationwide does not dispute that Thomas called the call center on December 28, 2001. But it does dispute that Thomas reported in that call that she had a settlement offer from State Farm and that she was requesting UIM coverage under her policy. Nationwide claims that the only evidence it has regarding the December 28, 2001 call is a fax from the Columbus Service Center to an office in Canton, with a "Pending—Personal Auto Notice of Loss" attached to the fax. The subject line of the fax indicates, "Pending Claim, [policy number] 12/17/1998." (Thomas argues that this proves that she had a claim pending since December 17, 1998. But Nationwide explained that is only the date of the accident, not the date the claim began pending.)

{¶ 51} Richard Gemperline, an attorney for Nationwide, testified that the notice of loss attached to the fax showed that Thomas only requested to open a medical claim because under "witness/comments," it indicated, "medical only

claim." The notice of loss also provided, "reserve code open," which Gemperline explained meant that the insurance company "sets aside money" to pay a claim.

{¶ 52} Penny Newman, an adjuster for Nationwide, contacted Thomas on January 7, 2002. Thomas said that she told Newman she had an offer for policy limits from State Farm, she wanted to accept the offer, and she wanted to know what she was entitled to under her policy at Nationwide.

{¶ 53} Thomas stated that she asked Newman several times during the conversation if she could accept the offer, "to make sure it was okay for me to do that." Thomas said that Newman "told me that I could accept it, that I was still entitled to the coverage from Nationwide." Thomas also stated that Newman then told her that she would "refer her claim to the field."

{¶ 54} Newman testified that in 2002, she had the authority to "make liability decisions" but could not "write the check." Newman stated that she could not personally recall her conversation with Thomas, but she knew that she had talked to her on January 7, 2002, because of the printout of the activity log (a "log that chronicles the activities of a particular claim") regarding Thomas's claim.

{¶ 55} The activity log regarding Thomas's claim began on December 28, 2001, when Thomas called the call center. Newman read an entry from the log that she entered into Nationwide's system regarding her first contact with Thomas: "PH [policy holder] called this date stating that CC [claimant carrier] offered her the CL [claimant] BI [bodily injury] limits of 100K. PH feels her claim is worth more than this as she has been suffering for 3 years. PH feels there is BIUM [bodily injury underinsured motorist] exposure. However, PH is atty rpd [attorney represented]."

{¶ 56} Thomas testified that when Newman called her, she already knew that Thomas was represented by an attorney because Newman told her, "she would have to check with my attorney." Thomas said that she explained to Newman that she was represented by an attorney in her case against State Farm but not regarding her UIM claim with Nationwide.[1]

{¶ 57} Gemperline agreed that there was nothing recorded in the activity log that showed that Thomas was being represented by an attorney for her UIM claim. The activity log showed that Thomas was represented for the underlying claim against the tortfeasor but not for her UIM claim.

{¶ 58} Thomas accepted State Farm's offer and released the Romanins on January 8, 2002. She said that she did so based on Newman's statement to her (the day before) that she could. Thomas explained that if at any time Prokopius,

---

1. Thomas admitted on cross-examination that she testified in her deposition that she told Newman she was represented by an attorney, not that Newman told her.

the person at Nationwide's call center, or Newman would have told her not to sign the release or warned her that she could lose her rights to UIM coverage, she would not have signed it.

{¶ 59} On January 10, 2002, Sandra Robinson, another Nationwide adjuster, called Thomas. Thomas said that she thought the call was to investigate her claim, but Robinson "immediately told [her] that she was denying [her] claim with Nationwide." ·

{¶ 60} Thomas testified she told Robinson that based on the information she received from Newman, she believed that she could accept the offer, so she did. Thomas said that Robinson told her, "We have freshman adjusters who don't give out proper information," and that Newman was "probably a young adjuster and didn't know all the info." Thomas testified, "I was * * * hysterical, because I relied, apparently to my detriment, according to Sandra Robinson, on a Nationwide adjuster telling me that I could accept this settlement and that I would be covered."

{¶ 61} Robinson wrote in a January 10, 2002 activity log entry that "[l]iability was determined to be 100 clear against clmt. driver for failure to maintain assured clear distance striking the rear of insured vehicle. Clmt carrier State Farm handled the damages to insured vehicle and they have also paid out their [bodily injury] limits of 100K." Robinson further stated in the log that she had informed Thomas that she received a fax from Thomas's attorney of the release that she had signed.

{¶ 62} Robinson sent an email to Gemperline and her supervisor that same day regarding the denial of the claim. She wrote, "[P]lease review log notes and letter that is saved as a draft under documents, and let me know if you agree with my denial of this claim." Gemperline replied, "I will need to see a copy of the release signed by the insured and the court's dismissal entry." Robinson responded, "I can fax you a copy of the release but I do not have a copy of the dismissal as of yet."

{¶ 63} On January 16, 2002, Gemperline emailed Robinson that he would have someone check the court's docket to see if the case had been dismissed and further stated, "I will have a [Reservation of Rights] letter for you as soon as I get that information." Gemperline said that he received a copy of the docket on January 17, 2002, and saw that the case against the Romanins had not yet been dismissed.

{¶ 64} Gemperline then had Robinson send the reservation-of-rights letter to Thomas on January 17, 2002, with a copy to her attorney. Gemperline explained that the purpose of a reservation-of-rights letter is to advise people that Nationwide needs to investigate the UIM claim. Robinson sent the letter and told

Gemperline that she would follow up "in a couple of weeks" to see if Thomas or her attorney had responded to the letter.

{¶ 65} Thomas said that when she received the reservation-of-rights letter from Robinson, she thought that the letter meant Nationwide had changed its mind and that it was going to "look into" the claim. Thomas responded with a letter to Robinson on January 28, explaining the reasons why she believed she was entitled to UIM coverage.

{¶ 66} On February 13, 2002, Gemperline received a copy of the dismissal, which had been "received for filing" in the clerk's office on January 24, 2002. He said that a decision was made to formally deny Thomas's UIM coverage on March 1, 2002. Gemperline wrote the March 4, 2002 letter denying coverage, which Robinson signed.

{¶ 67} The letter stated that Nationwide was denying Thomas UIM coverage because she "did not give Nationwide the reasonable opportunity to protect its subrogation rights before settling [the] claim with the at fault parties." The letter further indicated, "[O]ur investigation revealed that your accident occurred on December 17, 1998 and that you never reported the claim to our call center until January 7, 2002. * * * Our investigation has also shown that you notified Nationwide of your intent to settle your claim with the liability insurance carrier for the Romanins, State Farm Insurance, on January 7, 2002. You then signed a Full and Final Release * * * the next day, January 8, 2002. * * * Nationwide does not consider the one day's notice of your intent to settle your claim a reasonable opportunity to protect its subrogation rights."

{¶ 68} Gemperline agreed that no one at Nationwide attempted to find out if Thomas could get out of the release prior to the case being dismissed, nor did anyone at Nationwide tell Thomas that she should not sign the release before getting Nationwide's consent. Gemperline explained several times that it was stated in her policy.

{¶ 69} Gemperline agreed that "[o]ne of the issues in pursuing subrogation is to put a value on what it is you will get" in the subrogation. And he agreed that from the time Thomas reported that she had a settlement offer, on December 28, 2001, Nationwide did not do any investigation into the potential value of the subrogation claim, nor was there anything in Nationwide's records that showed that Robinson had reviewed Thomas's medical records before deciding to deny her coverage. Gemperline admitted that he did not consider the economic viability of the subrogation claim.

{¶ 70} Gemperline further agreed that he testified at his deposition that if Thomas had told Nationwide in December 2001 "of her intentions to resolve the underlying lawsuit with the Romanins for policy limits that she provided appro-

priate and timely notice" of her intent to settle. But Nationwide contends that nothing in the record shows that Thomas did so.

{¶ 71} Gemperline also agreed that Nationwide "has a potential exposure of $200,000 in a situation where there are policy limits of a hundred thousand for the tort-feasor and underinsured benefits of $300,000 from Nationwide." He agreed that before Nationwide would decide to pursue a subrogation claim, it would also consider if it "was economically worth it to hire lawyers." If Nationwide pursued the suit, it would have a right to recover "what [it] paid out."

{¶ 72} On cross-examination, Thomas said that she could not remember if she ever gave a copy of her complaint against the Romanins to any representative at Nationwide. She also stated that she did not submit "anything in writing" to Nationwide about "proof of her claim."

{¶ 73} Thomas agreed that in her letter to Robinson stating her reasons why she believed she was still entitled to UIM benefits, she stated, "Penny Newman never told me I couldn't accept the money," not that Newman told her to accept the settlement.

{¶ 74} Thomas said that she had a copy of her declarations, but she never had a copy of her insurance policy until she called Prokopius and got it in January 2002. She further agreed that she never sent a letter to Nationwide telling them that State Farm had offered its policy limits, nor did she ask for Nationwide's written consent to settle.

{¶ 75} The last witness to testify for Thomas was William Viscomi, an expert witness who had defended insurance companies for over 30 years. He opined that Thomas did not breach the prompt-notice provision or the consent-to-settle provision, nor did she prejudice Nationwide's subrogation rights. He also testified that Nationwide breached its duty to Thomas by not guiding her through the policy so that Thomas did not forfeit her right to UIM coverage.

### *FERRANDO* ANALYSIS: TWO–STEP INQUIRY

{¶ 76} In *Ferrando,* the Supreme Court explained that there are two types of notice that should not be confused. 98 Ohio St.3d 186, 2002-Ohio-7217, 781 N.E.2d 927, at ¶ 70. "One of those inquiries focuses on a 'prompt notice' clause specifically contained in an insurance policy that requires that an insured promptly give notice of an accident or claim to the UIM insurer. The other type of notice at issue is the notice inquiry that can be an inherent part of the question whether a consent-to-settle clause was complied with. For an insured to obtain consent from a UIM insurer to a proposed settlement, the insured first must give notice to the insurer that a settlement is being contemplated." Id.

{¶ 77} The Supreme Court further explained the purpose behind notice provisions in an insurance contract. Id. at ¶ 77. " 'Notice provisions allow the insurer to become aware of occurrences early enough that it can have a meaningful opportunity to investigate. *Ruby v. Midwestern Indemn. Co.* (1988), 40 Ohio St.3d 159, 161, 532 N.E.2d 730. In addition, it provides the insurer the ability to determine whether the allegations state a claim that is covered by the policy. It allows the insurer to step in and control the potential litigation, protect its own interests, maintain the proper reserves in its accounts, and pursue possible subrogation claims. Further, it allows insurers to make timely investigations of occurrences in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims.' (Citations omitted.)" Id.

{¶ 78} The Supreme Court outlined an analysis in *Ferrando* for cases involving an alleged breach of a prompt-notice condition and breach of a consent-to-settle or other subrogation-related provision.

{¶ 79} The court held, "[W]hen an insurer's denial of [uninsured or] underinsured motorist coverage is premised on the insured's breach of a prompt-notice provision in a policy of insurance, the insurer is relieved of the obligation to provide coverage if it is prejudiced by the insured's unreasonable delay in giving notice." Id. at paragraph one of the syllabus.

{¶ 80} It further concluded, "[W]hen an insurer's denial of underinsured motorist coverage is premised on the insured's breach of a consent-to-settle or other subrogation-related provision in a policy of insurance, the insurer is relieved of the obligation to provide coverage if it is prejudiced by the failure to protect its subrogation rights." Id. at paragraph two of the syllabus.

■ {¶ 81} In either a breach of a prompt-notice provision or a consent-to-settle or other subrogation provision, the Supreme Court held that the breach is "presumed prejudicial to the insurer absent evidence to the contrary." Id. at paragraphs one and two of the syllabus. Accordingly, the determination as to whether a breach of either provision relieves the insurer of its obligation to provide UM/UIM coverage involves a two-step inquiry. Id. at ¶ 89.

{¶ 82} The court must first ascertain whether a breach did in fact occur. Id. at ¶ 90–91. If a court decides there was no breach, then the inquiry "is at an end, and UIM coverage must be provided." Id. at ¶ 90–91.

■ {¶ 83} But if the court concludes that a breach occurred, then it must determine whether the insurer suffered prejudice such that UM/UIM coverage must be forfeited. Id. A presumption arises that the breach was prejudicial to the insurer, and the insured party bears the burden of presenting evidence to the contrary to rebut the presumption. Id.

## APPLICATION OF *FERRANDO*

{¶ 84} The trial court granted a directed verdict to Nationwide because it determined that Thomas breached the notice provisions and subrogation-related provisions of her policy. Civ.R. 50(A)(4) provides that the trial court may grant a directed verdict "upon any determinative issue." Thus, we must determine whether Thomas presented sufficient evidence on each issue, such that this issue should have been submitted to the jury. The three issues under Thomas's second assignment of error are (1) prompt notice; (2) consent-to-settle and other subrogation related provisions; and (3) prejudice.

A. Prompt–Notice Provision

{¶ 85} The "General Policy Considerations" under Thomas's policy with Nationwide required an insured to "give us or our agent prompt notice of all losses and provide written proof of claim if required." The "Uninsured Motorist" provision further specified that an insured "must submit written proof of claim to us," including, inter alia, the nature and extent of injuries and treatment and provide all facts of the accident and the names of all witnesses.

{¶ 86} Thomas contends that she gave proper notice of the loss to Nationwide because she called Prokopius and the Nationwide claim center within 24 hours of the accident.

{¶ 87} Under *Ferrando,* a court must consider all the facts and circumstances surrounding the notice to determine whether the insurance company received it within a reasonable time. Id. at ¶ 100, citing *Ruby v. Midwestern Indemn. Co.* (1988), 40 Ohio St.3d 159, 532 N.E.2d 730, syllabus. "As a general rule, if an insurance agent acting with apparent authority receives proper notice of a claim * * *, the notice is considered to have been received by the insurance company." *Helman v. Hartford Fire Ins. Co.* (1995), 105 Ohio App.3d 617, 623, 664 N.E.2d 991, citing *Hartford Cas. Ins. Co. v. Easley* (1993), 90 Ohio App.3d 525, 531, 630 N.E.2d 6.

{¶ 88} We agree with Thomas that reasonable minds could reach different conclusions as to whether she gave Nationwide "prompt notice" of the loss since she called Prokopius the day after the accident occurred. The policy did not require written notice of the loss. The policy did, however, require written notice of the claim. Thus, we must determine whether Thomas produced sufficient evidence, such that the trial court should have submitted this issue to the jury.

{¶ 89} Thomas testified that she called Prokopius, as well as Nationwide's claim center, on December 28, 2001, to inform Nationwide of the settlement offer of policy limits, to tell them that it was not sufficient to fully compensate her, and to inquire about her UIM benefits. Thomas admitted at trial, however, that she

never submitted written proof of her claim to Nationwide but contends that Nationwide waived its written-claim defense.

{¶ 90} In *Sweeney v. Grange Mut. Cas. Co.* (2001), 146 Ohio App.3d 380, 385–386, 766 N.E.2d 212, this court explained:

{¶ 91} " 'Waiver as applied to contracts is a voluntary relinquishment of a known right.' *White Co. v. Canton Trans. Co.* (1936), 131 Ohio St. 190, 5 O.O. 548, 2 N.E.2d 501, paragraph one of the syllabus. 'It may be made by express words or by conduct which renders impossible a performance by the other party, or which seems to dispense with complete performance at a time when the obligor might fully perform.' " Id. at 198, 2 N.E.2d 501, 5 O.O. 548, 2 N.E.2d 501; *N. Olmsted v. Eliza Jennings, Inc.* (1993), 91 Ohio App.3d 173, 180, 631 N.E.2d 1130, quoting *List & Son Co. v. Chase* (1909), 80 Ohio St. 42, 49, 88 N.E. 120.

{¶ 92} "It 'is a long-standing principle of law that an insurance policy is a contract, and that the relationship between insurer and insured is purely contractual in nature.' *Nationwide Mut. Ins. Co. v. Marsh* (1984), 15 Ohio St.3d 107, 109, 15 OBR 261, 472 N.E.2d 1061, citing *Ohio Farmers Ins. Co. v. Cochran* (1922), 104 Ohio St. 427, 135 N.E. 537.

■■ {¶ 93} "Likewise, it is a basic principle of contract law that a party to a contract who would benefit from a condition precedent to its performance may waive that condition. * * * 'A condition precedent is excused if it is waived by the party asserting its existence.' *Blommel Sign Corp. of Springfield v. Identity's* (Feb. 24, 1992), [2d Dist] No. 12900, * * *, 1992 WL 28152, citing 5 Williston on Contracts (3d Ed.1961), at 222. When a condition is excused, its nonperformance is no bar to recovery on the contract. Id., citing Williston on Contracts, *supra.* * * *

{¶ 94} "Significantly, the Supreme Court of Ohio has recognized this principle in the insurance law context, holding that where an insurance company has provided itself a right by contract, 'then relinquishment of such right by [the insurer's] own acts would reasonably constitute a waiver.' *Hounshell v. Am. States Ins. Co.* (1981), 67 Ohio St.2d 427, 430, 21 O.O.3d 267, 424 N.E.2d 311." (Brackets sic.)

{¶ 95} In *Stiggers v. Erie Ins. Group*, 8th Dist. No. 87654, 2006-Ohio-5920, 2006 WL 3233958, at ¶ 10, this court recently stated the following about an insurance policy requiring written notice and the issue of waiver:

{¶ 96} "There is no question here that notice to Erie is a condition precedent to coverage. The *real issue*, however, is whether Erie, through its agent, acted in such a way as to be estopped from asserting a defense of noncompliance with the notice provision, regardless of whether it may have been prejudiced by any delay in receiving notice from Stiggers. 'Conditions in insurance policies as to furnish-

ing various notices after loss in a certain manner, being for the benefit of the insurer, may be waived by words or conduct inconsistent with an intention to enforce strict compliance, from which the assured is led to believe that such compliance is unnecessary.' *Lind v. State Auto. Mut. Ins. Assn.* (1934), 128 Ohio St. 1, 7, 190 N.E. 138. See, also, *Ohio Farmers Ins. Co. v. Cochran* (1922), 104 Ohio St. 427, 135 N.E. 537 (insurer waived its right to immediate notice of loss when the acts and conduct of the insurer and its agents caused insured to fail to file notice within required time period)." (Emphasis added.)

{¶ 97} In *Woyma v. Begovic* (July 14, 1994), 8th Dist. No. 64985, 1994 WL 372548, the insured called her American Select agent two days after she was rear-ended by another vehicle. The insured asked her agent whether there was anything else she needed to do, and he told her no. The agent never advised "of the underinsured motorists' benefits which might potentially be available to her under her policy or the conditions that must be met in order to recover these benefits." Id. at *11.

{¶ 98} This court stated: " 'It is an established rule of law in Ohio that under certain circumstances an insurance carrier can waive its right to deny coverage or be estopped from such a denial. It is a well recognized rule that since provisions in insurance policies in respect of notice and proofs of loss, or, in the case of liability insurance, notice of accident, are inserted for the benefit of the insurer, they may be waived by the insurer in a case in which it has knowledge of the facts.' " *Woyma* at *11, quoting *Am. Select Ins. Co. v. Stopar* (Dec. 10, 1992), 8th Dist. Nos. 61158 and 61159, 1992 WL 369254.

{¶ 99} This court went on to hold that "[t]he substance of this testimony raised a jury question regarding whether American Select, through the words, acts or conduct of its authorized agent, waived the policy's written notice requirement. Thus, the trial court appropriately rendered an instruction to the jury on the issue of waiver. See *Greulich v. Monnin* (1943), 142 Ohio St. 113, 26 O.O. 314, 50 N.E.2d 310." *Woyma* at *11.

{¶ 100} In the case at bar, throughout the entire process, Thomas did as she had always done when she had a problem: she called her long-time Nationwide agent to tell him about a problem *and* ask him what she should do. She called him almost immediately after the accident to tell him about it. He advised her to pursue a claim through State Farm, which she did. When she was having problems with State Farm revealing its policy limits, she called him again. He told her that insurance carriers typically did not reveal limits and told her that she might have to sue them. She called Prokopius to tell them that she was going to file suit against State Farm. He agreed that she should. And when State Farm finally made its settlement offer, she called him to find out about her UIM coverage with Nationwide. As in *Woyma*, Prokopius never advised her of

the UIM benefits that might potentially be available to her under her policy or the conditions that must be met in order to recover these benefits.

{¶ 101} Moreover, at no time did Prokopius advise her that she needed to submit written proof of her claim to Nationwide. In fact, Prokopius told her to *call* the claim center to file a claim. And when she did, the person who took her information did not inform her that she needed to submit written proof of her claim. That person entered Thomas's claim information into Nationwide's computerized notice-of-loss form, which was then faxed to the Canton office. Thomas was then told that someone would contact her. Approximately one week later, Penny Newman called Thomas. Again, she never asked Thomas to submit anything in writing regarding her claim. Thomas did everything her agent, a person at the claims center, and a Nationwide adjuster, told her do.

{¶ 102} After reviewing the facts presented at trial, we conclude that Thomas presented sufficient evidence, *if believed*, that would permit reasonable minds to reach different conclusions on the issue of whether Nationwide, by its words, actions, and conduct, waived the strict compliance of requiring Thomas to submit written proof of her claim.

{¶ 103} Thomas's second assignment of error, with respect to "prompt notice," has merit, and thus she is entitled to a new trial on this issue.

B. Consent–to–Settle and Other Subrogation Provisions

{¶ 104} The policy at question here required an insured to "promptly deliver to us all papers dealing with any claims or suits" and to obtain Nationwide's written consent to "settle any legal action brought against any liable party."

{¶ 105} Thomas testified that she could not recall whether she had sent a copy of the suit to Nationwide, but Nationwide claims it did not receive one. It is undisputed, however, that Thomas did not obtain written consent from Nationwide to settle her suit against the Romanins. Thomas argues that Nationwide also waived its written-consent defense.

{¶ 106} Thomas informed Prokopius of the problems that she was having with State Farm and eventually told him that she was going to sue the Romanins. Again, he did not advise her at that time—before she filed the action—that she needed to send Nationwide a copy of the suit. Then, when she called Prokopius in December 2001 to tell him about the settlement offer, he did not tell her to send a copy of the suit or warn her that if she settled the suit without Nationwide's written consent, she would forfeit her UIM benefits.

{¶ 107} Not only did Prokopius fail to advise Thomas in any way of what she needed to do to protect her UIM benefits, neither did the person at the claim center, nor did the adjusters, Newman or Robinson.

{¶ 108} In addition, Thomas testified that Newman orally told her that she could accept the offer from State Farm and that she relied on that information to her detriment. Newman could not recall the conversation. Thomas further testified that she told Robinson that Newman told her that she could accept the settlement, and she said that Robinson replied that Newman must be a new adjuster who did not know what she was talking about.

{¶ 109} Nationwide agrees with Thomas that it had a duty to aid her in the preservation of its subrogation rights but disputes that it had to assist her with her policy. Nationwide contends that mere silence does not amount to waiver and claims that Thomas should have just read her policy to know what she needed to do to protect her UIM benefits.

{¶ 110} We agree that mere silence does not amount to waiver and that Thomas had a duty to examine her policy. Under the facts of this case, however, we agree with Thomas that—at a minimum—the evidence presented is sufficient, *if believed*, such that it should have gone to the jury. A fact-finder, as a matter of law, could reach different conclusions on the issue of whether Nationwide waived its written-consent requirements under the policy.

{¶ 111} Thus, the trial court erred by granting a directed verdict to Nationwide and as such, Thomas is entitled to a new trial. Thomas's second assignment of error, with respect to consent-to-settle and written-proof-of-claim provisions, is sustained.

## C. Prejudice

{¶ 112} Nationwide contends that Thomas did not present any evidence to rebut the presumption of prejudice. We disagree.

{¶ 113} Gemperline testified that when he found out that Thomas had settled with State Farm, he knew that the suit had not yet been dismissed. He said that no one attempted to find out if Thomas could still get out of the release since the case had not yet been dismissed.

{¶ 114} Gemperline agreed that Nationwide was possibly facing $200,000 of UIM benefits exposure, since Thomas had $300,000 worth of coverage and she had received $100,000 from State Farm. He agreed that before it could pursue a subrogation claim, it had to consider many issues, such as the costs of "fronting" the settlement money to Thomas, and hiring lawyers to defend the suit to recover what it paid out.

{¶ 115} Thomas's expert witness testified that Thomas did not prejudice Nationwide's subrogation rights by signing the release. He explained that since the dismissal entry had not been filed yet, Nationwide still could have made an attempt to protect its subrogation rights. In his 30 years of experience, he said that he has "seen releases voided because of circumstances," and "until the case is over, it is not dismissed."

{¶ 116} The expert further testified that in order for Nationwide to pursue its subrogation rights, it would have had to "go after the father of the young man who struck Ms. Thomas's vehicle. That is a negligent entrustment claim. * * * That opportunity was really nonexistent." First, he explained that "[a] negligent entrustment claim * * * is extremely difficult," and stated, "[A]s I understand the facts of this case, there was no evidence of negligent entrustment, so that action would have been fruitless, would have been costly." He explained that Nationwide would have been taking "a great chance, because the claim against the father is—is so thin that they would realize it's not something that they would pursue."

{¶ 117} And the expert stated that before Nationwide could pursue the wrongdoer, it would have to take over Thomas's suit, pay Thomas $100,000, and then pay her legal fees. Therefore, he opined that a negligent-entrustment claim "would have been fruitless [and] costly."

{¶ 118} After reviewing the record, it is our view that Thomas did present sufficient evidence, *if believed*, that would permit reasonable fact-finders to reach different conclusions as to whether Nationwide was actually prejudiced by her accepting the settlement and releasing the Romanins. Thus, the trial court erred by granting directed verdict to Nationwide.

{¶ 119} Accordingly, Thomas's second assignment of error is also sustained with respect to the issue of prejudice under a *Ferrando* analysis.

{¶ 120} Thomas's third assignment of error is rendered moot by our disposition of the second assignment.

## BIFURCATION

{¶ 121} In her fourth assignment of error, Thomas maintains that the trial court erred when it bifurcated the coverage issue and when it made erroneous evidentiary rulings unrelated to the bifurcation. Although Thomas does not cite any authority for her arguments, we will address them briefly as they are likely to arise during retrial.

{¶ 122} Thomas contends that by bifurcating her bad-faith claims, it limited her ability to discover evidence on the coverage issue. We disagree.

{¶ 123} Civ.R. 42(B) provides that a "court, after a hearing, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, or third-party claims, or issues, always preserving inviolate the right to trial by jury."

{¶ 124} "The decision of whether or not to bifurcate the proceedings * * * is a matter within the sound discretion of the trial court. *Sheets v. Norfolk S. Corp.* (1996), 109 Ohio App.3d 278, 288, 671 N.E.2d 1364, citing *Heidbreder v. Trustees* (1979), 64 Ohio App.2d 95, 100, 18 O.O.3d 78, 411 N.E.2d 825. We will not disturb the trial court's decision to bifurcate the trial, pursuant to Civ.R. 42(B), absent an abuse of discretion. *Clark v. Univ. Hosps. of Cleveland* [(2001)], 8th Dist. No. 78854, 2001 WL 995104." *Fraysure v. A–Best Products Co.*, 8th Dist. No. 83017, 2003-Ohio-6882, 2003 WL 22971024, at ¶ 14.

{¶ 125} "The trial court is free to order separate trials of separate issues whenever it will further convenience, avoid prejudice, or be conductive to expedition and economy. A trial court is in the best position to ascertain whether a bifurcation of the issues is necessary and that court, therefore, has broad discretion in doing so. *Fairfield Commons Condominium* [*Assn.*] *v. Stasa* (1985), 30 Ohio App.3d 11, 506 N.E.2d 237." Id. at ¶ 13.

{¶ 126} In bifurcating the claims, the trial court relied on *Garg v. State Auto. Mut. Ins. Co.*, 155 Ohio App.3d 258, 800 N.E.2d 757, 2003-Ohio-5960. In that case, the Second District held that the trial court abused its discretion when it failed to bifurcate the bad-faith insurance claims—because not bifurcating the claims would have been "grossly prejudicial" to the insurance company. Id. at ¶ 29. Thus, we cannot say the trial court here abused its discretion when it bifurcated the bad-faith and tort-related claims.

## USE OF CIV.R. 30(B)(5) DEPOSITION AT TRIAL

{¶ 127} As for Thomas's arguments regarding the trial court's evidentiary rulings, evidentiary rulings are within the trial court's sound discretion and are not reversed absent an abuse of discretion. *Kozak v. Jackson*, 8th Dist. No. 88851, 2008-Ohio-50, at ¶ 30.

{¶ 128} Thomas argues that the trial court abused its discretion when it refused to allow her to play Gemperline's Civ.R. 30(B)(5) video deposition for the jury. Nationwide identified Gemperline as the person who would testify on its behalf pursuant to Civ.R. 30(B)(5).

{¶ 129} Civ.R. 30(B)(5) provides that a party may name a corporation as the deponent and "designate with reasonable particularity the matters on which

examination is requested." The corporation "so named shall choose one or more of its proper employees, officers, agents, or other persons duly authorized to testify on its behalf. The persons so designated shall testify as to matters known or available to the organization."

{¶ 130} Thomas conducted the deposition and filed it timely, as required by Civ.R. 32(A) if it is going to be used at trial.

{¶ 131} Under Civ.R. 32(A)(2), a deposition taken pursuant to Civ.R. 30(B)(5) may be used at trial for *any purpose*. It states:

{¶ 132} "The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30(B)(5) or Rule 31(A) to testify on behalf of a public or private corporation, partnership or association which is a party may be used by an adverse party for any purpose."

{¶ 133} The 1970 staff notes to Civ.R. 32(A)(2) indicate that "a party may use the deposition of an adverse party or the persons enumerated in Rule 30(B)(5) not only for impeachment purposes, but also as substantive evidence."

{¶ 134} Since the trial court would not permit the deposition to be played, Thomas was forced to question Gemperline as the corporation *and* as an employee of the corporation. Thomas argues that "Nationwide received the benefit of having Gemperline [be] able to avoid adverse admissions by framing his testimony in terms of what he personally knew, rather than what his employer knew as a corporate entity."

{¶ 135} The trial court stated, "I'm going to allow Mr. Gemperline to testify and be called as a witness. He can be cross-examined or impeached with respect to the deposition that was given, but I'm not going to allow under [Civ.R.]30(B)(5) Mr. Gemperline's video deposition." The trial court reasoned, "[M]y ruling is really based in conjunction with two things. One is the prejudicial value of being placed in front of a jury where there's 70–plus objections, ruling on those objections, and having that before a jury and skipping through the objections, I believe is prejudicial in the fact that you have listed Mr. Gemperline already as a witness. * * * I'll let him speak to both the issue individually as well as his corporate capacity in his testimony provided by yourself."

{¶ 136} Thus, the trial court permitted Thomas to use the deposition for impeachment purposes, which she did, but not as "substantive evidence," as the rule allows. It appears that the trial court relied on Civ.R. 32(A)(3), which addresses the use of a witness's deposition at trial when a witness is not available to testify (because, for example, the witness has passed away or is not within the subpoena power of the court). We agree with Thomas that under Civ.R. 32(A)(2), "unavailability or impeachment is not the issue."

{¶ 137} In addition, the trial court cannot make a determination as to whether the "70–plus objections" are prejudicial—until the trial court actually hears those objections and rules upon them.

{¶ 138} Therefore, we agree that the trial court abused its discretion by not allowing Thomas to play Gemperline's video deposition to the jury.

## CALLING A WITNESS AS IF ON CROSS–EXAMINATION

{¶ 139} Thomas also argues that the trial court abused its discretion by not allowing her to call Prokopius as if on cross-examination. For the following reasons, we agree.

{¶ 140} "Whether a party may ask leading questions and examine its own witness as if on cross-examination is within the discretion of the trial court. *Ramage v. Central Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, paragraph six of the syllabus, citing *Seley v. G.D. Searle & Co.* (1981), 67 Ohio St.2d 192, 204, 21 O.O.3d 121, 423 N.E.2d 831." *Sidenstricker v. Miller Pavement Maintenance, Inc.,* 158 Ohio App.3d 356, 2004-Ohio-4653, 815 N.E.2d 736, at ¶ 19.

{¶ 141} In *Smith v. Mitchell* (1988), 35 Ohio St.3d 237, 239, 520 N.E.2d 213, the Ohio Supreme Court explained:

{¶ 142} "One of the oldest and most fundamental rights in the Anglo–American system of evidence is the right of a party to cross-examine an adverse witness. The value of the right of cross-examination is well-settled in Ohio jurisprudence. ' * * * The importance of the *right* of full cross-examination, of an adverse witness, can scarcely be overestimated. As a test of the accuracy, truthfulness, and credibility of testimony, it is invaluable.' (Emphasis added.) *Martin v. Elden* (1877), 32 Ohio St. 282, 287. 'The term cross-examination would not perhaps strictly import any thing more than a leading and searching inquiry of the witness for further disclosures touching the particular matters detailed by him in his examination in chief. This, however, is said to be one of the principal and most efficacious tests which the law has devised for the discovery of truth. And inasmuch as it has for its object the disclosure of not merely the extent and degree of accuracy of the witness' knowledge, as well as the means of his knowledge, but also his motives, inclinations, powers of memory and relative situation in respect to the parties, and the subject matter of the investigation, it becomes an important test of the credibility of the witness.' *Legg v. Drake* (1853), 1 Ohio St. 286, 291."

{¶ 143} R.C. 2317.52 sets forth when agents or employees may be cross-examined:

{¶ 144} "When the action or proceeding relates to a transaction or occurrence in which it has been shown or it is admitted that the adverse party acted either in whole or in part through an agent or employee, such agent or employee of the adverse party may be called as a witness and examined as if under cross-examination upon any matters at issue between the parties which are shown or admitted to have been within the scope of such agent's or employee's authority or employment."

{¶ 145} Evid.R. 611 mandates that courts must "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

{¶ 146} Evid.R. 611(C) further provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."

{¶ 147} There is no question that Prokopius was an agent for Nationwide. He testified that he had been an agent for Nationwide for 24 years. Prokopius stated that if Nationwide sold a product, he had to sell it. His business card indicated that he was a principal agent for Nationwide. Thomas had been his customer from the beginning and had purchased life, home, and automobile insurance for four cars from him.

{¶ 148} After reviewing the record in its entirety, it is clear that Prokopius was an adverse or hostile witness to Thomas. The trial court refused to permit Thomas to delve into Prokopius's biases in favor of Nationwide, his pecuniary interests gained from working as a Nationwide agent for 24 years, and his knowledge and understanding of the insurance contract.

{¶ 149} By not allowing Thomas to call him as if on cross-examination, the trial court prejudiced her ability to fully discover the truth, the extent and degree of accuracy of his knowledge, "but also his motives, inclinations, powers of memory and relative situation in respect to the parties, and the subject matter of the investigation, it becomes an important test of the credibility of the witness." *Mitchell,* 35 Ohio St.3d at 239, 520 N.E.2d 213. Therefore, it is our view that the trial court abused its discretion by not permitting Thomas to call Prokopius as if on cross-examination.

{¶ 150} Thomas's fourth assignment of error has merit with respect to the trial court's refusal to allow her to use Gemperline's video deposition at trial and its

refusal to allow her to call Prokopius as if on cross-examination, but not regarding the bifurcation of claims or her other various evidentiary issues.

{¶ 151} Accordingly, Thomas's first, third, and fourth (in part) assignments of error are not well taken. Thomas's second and fourth (in part) assignments are sustained. The judgment of the Cuyahoga County Court of Common Pleas is reversed, and the cause is remanded. The trial court is instructed to conduct a new trial on the issue of coverage and breach of contract.

Judgment reversed
and cause remanded.

McMONAGLE, J., concurs.

ROCCO, P.J., concurs in part and dissents in part.

ROCCO, Presiding Judge, concurring in part and dissenting in part.

{¶ 152} The sole basis for the court's decision was stated in its October 24, 2006 order: "Plaintiff failed to comply with the express terms of her insurance policy requiring proper notice to the insurer of settlement of her personal injury claims and release of the tortfeasor, resulting in a determination of prejudice to the insurer * * *." In my opinion, this is not a declaration of the parties' rights and obligations under their contract. Therefore, I would dismiss this appeal for lack of a final, appealable order. See *Am. Family Ins. Co. v. Johnson*, Cuyahoga App. No. 90062, 2008-Ohio-2181, 2008 WL 1974137, ¶ 12–13.

{¶ 153} Even if I agreed that there was a final order here, large portions of the majority's analysis are devoted to issues not decided by the common pleas court or necessary to this appeal. First, the majority addresses whether Thomas provided Nationwide with prompt notice of her loss. The trial court did not even decide this issue. Second, while the trial court did determine that plaintiff had not complied with the consent-to-settle provisions of her contract, analysis of this issue is not necessary to decide this appeal. Even if Thomas failed to comply with either the notice of claim or the consent-to-settle provisions of her contract, Thomas presented evidence from which a reasonable fact-finder could conclude that Nationwide was not prejudiced. This fact alone made the trial court's decision erroneous and requires a new trial.