[Cite as *MacDonald v. Auto-Owners*, 2012-Ohio-5949.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

ROBERT E. MACDONALD, ET AL.,

    PLAINTIFFS-APPELLEES,          CASE NO.  1-12-25

    v.

AUTO-OWNERS INS. CO.,

    DEFENDANT-APPELLANT.
    -AND-                  O P I N I O N

CRAWFORD AND CO.,  ET AL.,

    DEFENDANTS-APPELLEES.

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CV 2011 0048**

**Judgment Affirmed**

**Date of Decision:    December 17, 2012**

APPEARANCES:

    *J. Alan Smith* for Appellant

    *Michael A. Rumer and Victoria Maisch Rumer*  for Appellees,
        Robert E. and Jean MacDonald

    *Robert B. Fitzgerald*  for Appellee, Webb Insurance Agency

    *Michael L. Clark*  for Appellee, Perfectaclene, Inc.

Case No. 1-12-25

**PRESTON, J.**

{¶1} Defendant-appellant, Auto-Owners Insurance Company, Inc. (hereinafter "Owners")[1] appeals the Allen County Court of Common Pleas' grant of summary judgment in favor of homeowners/plaintiffs-appellees, Robert E. MacDonald ("MacDonald") and Jean E. MacDonald (collectively "the MacDonalds"), declaring that the water damage the MacDonalds sustained at their Spencerville home was covered under their Owners insurance policy. We affirm.

{¶2} On March 23, 1961, the MacDonalds purchased a three-story home ("the Spencerville home") located at 547 North Broadway Street in Spencerville, Ohio, where the couple raised their four children. (MacDonald Depo. at 9, 118); (D's Exs. J, Pg. 62; G); (MacDonald Depo. II at 5, 75). In 2006, MacDonald discontinued operations at his Spencerville plant and retired, and the MacDonalds moved to Michigan in 2007. (MacDonald Depo. at 13, 19).

{¶3} During 2008, the MacDonalds continued to use the Spencerville home while visiting family and friends in Ohio, picked up any accumulated mail at the post office in Spencerville, and leased the apartment above the garage at the Spencerville home. (MacDonald Depo. 12, 14, 20-23, 29, 119); (MacDonald Depo. II at 75). By the end of 2008, the MacDonalds had moved their remaining

---

[1] The parties indicated in their briefs and at oral argument that the proper name for this party is "Owners Insurance Company"; and therefore, this Court will refer to it by this name.

personal property from the Spencerville home to Michigan. (MacDonald Depo. at 22, 119); (MacDonald Depo. II at 76).

**{¶4}** On September 14, 2008, high winds blew shingles off of the roof of the Spencerville home and, Encompass Insurance Company ("Encompass"), the insurer prior to 2009 and not a party herein, paid to repair the damage. (MacDonald Depo. at 128-130); (D's Exs. J, Pg. 67; G); (MacDonald Depo. II at 5); (P's Ex. 30).

**{¶5}** On or about December 8, 2008, Robert MacDonald informed his insurance agent, Roger Stokes of Webb Insurance, that the Spencerville home was empty of its contents, and Doris Proctor ("Proctor") would be leasing the home for the operation of her business, Flowerful by Design, beginning January 1, 2009. (MacDonald Depo. at 24-25, 32-33); (Stokes Depo. at 14-15); (P's Ex. 30). Stokes told MacDonald that his homeowners' insurance policy, at that time with Encompass, would need to be changed into a commercial insurance policy. (MacDonald Depo. at 32-33); (P's Ex. 30). The new commercial insurance policy for the Spencerville home was issued by Owners, effective January 22, 2009. (Stokes Depo. at 14-15, 90); (P's Ex. 30).

**{¶6}** On or about February 11, 2009, the Spencerville home sustained additional wind damage, and Owners paid to re-shingle the entire roof.

(MacDonald Depo. at 41-42, 62, 128); (MacDonald Depo. II at 6, 122); (D's Ex. J, Pgs. 69, 72, 74).

{¶7} On March 12, 2009, Stokes mailed a copy of the Owners' insurance policy to MacDonald. (MacDonald Depo. at 132-133); (MacDonald Depo. II at 127); (D's Exs. H, W); (Stokes Depo. at 51).

{¶8} On June 1, 2009, Dave Miller, the MacDonalds' property manager for the Spencerville home, wrote Proctor a 30-day eviction notice for allegedly failing to pay rent. (D's Ex. I; J, Pg. 66); (MacDonald Depo. at 137). On July 1, 2009, Proctor vacated the Spencerville home, and it remained vacant through June 23, 2010, the date of the loss giving rise to this case. (*Id*. at 27).

{¶9} On or about September 25, 2009, MacDonald informed Stokes that Proctor was no longer operating her business out of the Spencerville home, and it was for sale or lease through Yocum Realty. (MacDonald Depo. at 45, 64, 143, 146-147); (MacDonald Depo. II at 77-79); (D's Exs. J, Pg. 75; L; M) (Stokes Depo. 17, 90, 102); (P's Ex. 30). Stokes informed MacDonald that, as a result of the tenant vacating the premises, Owners might not renew his policy for 2010, but they would address that at the beginning of the year. (MacDonald Depo. at 64-65).

{¶10} On January 11, 2010, Webb Insurance notified Owners that the Spencerville home was "unoccupied"; nevertheless, Owners renewed the insurance policy on January 22, 2010. (Stokes Depo. at 19, 22); (P's Ex. 27).

{¶11} On June 2, 2010, Mike Sarno, another Webb Insurance agent, called MacDonald for an update on the Spencerville home. MacDonald informed Sarno that the home was still for sale or lease. (MacDonald Depo. at 65-66); (MacDonald Depo. II at 19); (P's Ex. 30); (Stokes Depo. at 27-30).

{¶12} On June 3, 2010, Owners notified Webb Insurance that they would remain on the policy until January 22, 2011, but it would cancel the policy thereafter since the home was unoccupied. (P's Ex. 30); (Stokes Depo. at 27).

{¶13} On June 23, 2010, MacDonald visited the Spencerville home and discovered extensive water damage, originating from a water line rupture in the attic space near the third floor bathroom, and reported the damage to Webb Insurance. (MacDonald Depo. at 54, 56-57, 163); (K. Burden Depo. at 99). Since the MacDonalds were scheduled to leave for British Columbia the next day, MacDonald asked his daughter and son-in-law, Melissa and Clark Prichard, to handle the insurance claim while they were gone. (MacDonald Depo. at 168).

{¶14} On June 24, 2010, Owners assigned the loss, identified as claim number 5-1979-10, to Crawford & Company, an adjusting company, who assigned

the claim to their employee, Shawn Burden ("Shawn"). (S. Burden Depo. at 167); (P's Exs. 1-2); (Alt Depo. at 17).

{¶15} Phyllis Collins was a retired claims manager who returned for two weeks in June 2010 to help Owners while Debra Alt, the current claims manager, was on medical leave. On June 25, 2010, Shawn informed Collins that he would be inspecting the MacDonalds' loss that afternoon. (S. Burden Depo. at 23, 157); (Collins Depo. at 7, 13, 18); (Alt Depo. at 19-20). Collins informed Shawn that the property had previous water damage and asked Shawn to determine whether the previous damage had been mitigated. (S. Burden Depo. at 24); (Collins Depo. at 14, 26-27, 32). That same day, Shawn met with Clark Prichard and Brad Case, a contractor with PerfectaClene, Inc., d.b.a. ServiceMaster by Case, at the Spencerville home to discuss the water damage and the repair process. (S. Burden Depo. at 32-33, 38, 247); (C. Prichard Depo. at 20, 26). Clark Pritchard signed a work authorization for ServiceMaster to begin removing water and materials that were too wet to be dried or were contaminated by mold. (P's Ex. 14); (MacDonald Depo. II at 34-35, 47, 53, 55); (D's Exs. Q, R, S, & T); (C. Prichard Depo. at 22, 29-30, 87).

{¶16} On June 28, 2010, Shawn returned to the Spencerville home to discuss the water damage with Case and Ken Burden[2] of KB Construction, who

---

[2] Ken Burden and Shawn Burden are first cousins. (S. Burden Depo. at 48).

was subcontracted by Case to handle the removal of mold-contaminated materials in the home. (S. Burden Depo. at 44-45, 50, 62, 221); (K. Burden Depo. at 6-8).

{¶17} On June 29, 2010, Shawn's supervisor, Pat Stenger, asked him to verify insurance coverage for the claim. (S. Burden Depo. at 171-172). KB Construction began demolition at the home this same day. (K. Burden Depo. at 37-38).

{¶18} On July 1, 2010, Shawn told Collins that the previous water damage had been repaired. (S. Burden Depo. at 24, 162). On that same day, Shawn submitted his first "preliminary" written report, which contained a notation questioning whether or not the MacDonalds had mold coverage under their insurance policy. (*Id*. at 51-52, 58-59, 83, 152); (P's Ex. 4). No other insurance coverage concerns were noted at that time. (P's Ex. 4). Melissa Prichard also visited the Spencerville home that same day and halted KB Construction's demolition after Aaron Roberts, a contractor from Greg's Contracting who accompanied her that day, indicated he thought the demolition was excessive. (S. Burden Depo. at 64-67); (M. Prichard Depo. at 33-36, 65, 135, 150). ServiceMaster stopped working as well, and Case notified Shawn of the situation. (S. Burden Depo. at 65). Later that day, Melissa called Shawn to discuss the demolition, and Shawn assured her that the level of demolition was necessary to remove materials that were too saturated to be saved. (*Id*. at 67). Shawn also

assured Melissa that the home would be restored to its original condition after the repairs were complete since her father had "Cadillac insurance". (*Id.*); (M. Prichard Depo. at 36, 39-40).

{¶19} On July 7, 2010, after returning from British Columbia, MacDonald met with Shawn for the first time at the home. (MacDonald Depo. II at 30, 58-62, 81-82, 88); (MacDonald Depo. at 67-68); (S. Burden Depo. at 46). During that initial meeting, Shawn walked MacDonald through the home, telling him several times that "the house is well insured" and would be "restored to equal to or better than" it was before the damage. (MacDonald Depo. at 67-70). KB Construction resumed the demolition on that same day. (K. Burden Depo. at 46).

{¶20} On July 19, 2010, MacDonald returned to the Spencerville home a second time to discuss filling out the Owners' proof of loss form with Shawn. (MacDonald Depo. II at 63, 98-99, 118); (D's Ex. F); (S. Burden Depo. at 71-72). Shawn told MacDonald not to worry about the form, everything was covered under insurance, and that he would fill it out on his computer. (MacDonald Depo. at 63-65); (S. Burden Depo. at 71-72).

{¶21} On July 23, 2010, KB Construction finished the demolition work and, on July 26, 2010, invoiced the MacDonalds in the amount of $24,458.74. (K. Burden Depo. at 54-55); (P's Ex. 3).

**{¶22}** On August 3, 2010, Melissa Prichard signed a certificate of completion for the work done by ServiceMaster. (D's Ex. U); (P's Ex. 18); (M. Prichard Depo. at 15, 70-71).

**{¶23}** On August 9, 2010, Shawn wrote his second report, estimating the total loss at $224,227.98; by this time, Owners still had not informed Shawn whether or not mold removal was covered under the insurance policy. (S. Burden Depo. at 81, 83, 152); (P's Ex. 5); (Alt Depo. at 38). Since he had not heard back from Owners concerning the mold coverage issue, Shawn assumed that it was covered under the policy, so under the "policy issues" section of his report, Shawn wrote "No known Issues." (S. Burden Depo. at 25-26, 83); (P's Ex. 5). Shawn also recommended that Owners pay KB Construction, ServiceMaster, and EarthSafe Ozone for the work they completed on the home. (S. Burden Depo. at 87); (P's Ex. 5).

**{¶24}** On August 10, 2010, Shawn spoke with Alt, who expressed her concern that the MacDonalds might not have insurance coverage because the home was vacant for 60 days preceding the loss. (S. Burden Depo. at 26, 213); (Alt Depo. at 38-40); (Joint Ex. 1, Pg. 178). Alt asked Shawn to investigate whether there were any sudden spikes in the water consumption at the home prior to the date the damage was discovered. (S. Burden Depo. at 26, 213); (Alt Depo. at 38-40). Shawn subsequently discovered that over 27,000 gallons of water

entered the home in June 2010 as a result of the water line rupture. (S. Burden Depo. at 27); (Alt Depo. at 39); (MacDonald Depo. II at 28); (Joint Ex. 1, Pg. 117).

{¶25} On August 24, 2010, Shawn wrote his third report. (S. Burden Depo. at 94); (P's Ex. 6). Under the "policy issues" section of the report, it still indicated "No known Issues." (*Id.*).

{¶26} On August 31, 2010, Alt called Jake Block, an Owners' home office claims manager, to discuss Crawford & Company's approval of demolition without Owners' approval. (Alt Depo. at 43). Block advised Alt to discuss the matter with Shawn's supervisor, but Jim Kuhlman, Alt's direct supervisor, advised her to discuss the matter with Shawn first to allow him an opportunity to respond. (*Id.* at 43-46). Alt called Shawn and informed him that Owners felt that Crawford should be responsible for the demolition costs since he authorized the work without their prior approval. (*Id.*). Shawn advised that he would talk with his supervisor about the situation and notify her of Crawford's decision. (*Id.*).

{¶27} On September 7, 2010, Alt conducted a recorded telephone conversation with MacDonald to determine if the home was vacant 60 days prior to the damage. (MacDonald Depo. at 79); (MacDonald Depo. II at 119); (D's Ex. D); (Alt Depo. at 132-135). During this conversation, MacDonald informed Alt that the home had been vacant since July 2009. (D's Ex. D).

{¶28} On September 10, 2010, Owners issued a letter to the MacDonalds denying their insurance claim since water damage is excluded from coverage under the policy in the event the property is vacant for 60 days or more preceding the loss. (Alt Depo. at 123); (P's Ex. 28); (Joint Ex. 1, Pg. 94).

{¶29} On September 13, 2010, Shawn submitted his closing report. (S. Burden Depo. at 98); (P's Ex. 7). On September 14, 2010, MacDonald called his Webb Insurance agent, Stokes, about the Owners' denial letter, and Stokes told MacDonald that he should be reimbursed for any work Shawn authorized, but there was no coverage for the rest of the damages. (P's Ex. 30); (Stokes Depo. at 34).

{¶30} After the insurance company denied coverage, the companies that performed work at the Spencerville home filed suits seeking payment from the MacDonalds, resulting in two separate lawsuits.

{¶31} On November 29, 2010, ServiceMaster filed a complaint against the MacDonalds in Lima Municipal Court seeking payment of $7,190.09 for water damage mitigation. (Trial Court Case No. 10CVE04582). On February 22, 2011, the MacDonalds filed an answer. On June 22, 2011, the MacDonalds filed a counter-claim against ServiceMaster alleging that it negligently authorized Earth Safe Leasing, Inc. d.b.a. Earth Safe Ozone to perform mold remediation services and KB Construction to perform demolition within the home damaging the

MacDonalds in excess of $200,000. The MacDonalds also filed a motion to transfer the case to the Allen County Court of Common Pleas, which the trial court granted that same day. The case was assigned case no. CV 2011 0477 upon transfer.

{¶32} On December 14, 2010, Earth Safe Leasing, Inc. d.b.a. Earth Safe Ozone filed a complaint in the Lima Municipal Court against the MacDonalds, Shawn Burden, and Crawford & Company seeking payment of $6,869.40 for its mold and mildew remediation work. (Trial Court Case No. 10CVF04793). On January 24, 2011, the MacDonalds filed an answer and cross-claim against Crawford & Company, alleging that its employee, Shawn Burden, negligently represented that the loss was covered under the MacDonalds' insurance policy and negligently authorized KB Construction to perform demolition at the Spencerville home. On January 25, 2011, the case was transferred to the Allen County Court of Common Pleas, where it was assigned case no. CV 2011 0069.

{¶33} On January 25, 2011, the MacDonalds filed a complaint against Owners, Crawford & Company, Webb Insurance Agency, Inc., and Ken Burden d.b.a. Ken Burden Construction, in the Allen County Court of Common Pleas, which was assigned case no. CV 2011 0048. (Doc. No. 1). In relevant part, the MacDonalds sought a declaration from the trial court that the water damage was covered under the Owners' insurance policy. The trial court subsequently

consolidated case nos. CV 2011 0047 and CV 2011 0069 into case no. CV 2011 0048. (Doc. No. 19)

{¶34} On February 22, 2011, Crawford filed its answer, and Owners filed its answer, counter-claim against the MacDonalds, and a cross-claim against Crawford & Company. (Doc. Nos. 8, 10). On February 28, 2011, Webb Insurance filed its answer. (Doc. No. 13).

{¶35} On March 3, 2011, the MacDonalds filed a reply to Owners' counter-claim. (Doc. No. 18). On March 18, 2011, Crawford filed its answer to Owners' cross-claim. (Doc. No. 21). On March 23, 2011, Ken Burden filed his answer upon leave of court. (Doc. Nos. 16, 22).

{¶36} On May 16, 2011, Crawford filed a motion to stay and bifurcate claims against Crawford and Shawn Burden pending a determination of insurance coverage. (Doc. N. 37). On May 24, 2011, the MacDonalds filed a memo in opposition. (Doc. No. 39). On May 25, 2011, Owners joined the MacDonalds in opposing Crawford's motion. (Doc. No. 40).

{¶37} On June 7, 2011, the trial court granted the motion to stay and bifurcated the claims against Crawford and Shawn Burden pending resolution of the insurance coverage claims. (Doc. No. 46). The trial court ordered the parties to submit summary judgment motions on the issue of insurance coverage by July 15, 2011. (Doc. No. 47).

{¶38} On June 28, 2011, the trial court ordered a realignment of the parties following the consolidation of the three separate cases. (Doc. No. 54). The trial court found that Robert E. and Jean MacDonald should be named as plaintiffs; Auto-Owners Insurance Co., Crawford and Company, Webb Insurance Agency, Inc., Ken Burden d.b.a. "KB Construction," and Earthsafe Leasing, Inc. should be named as defendants. (*Id*.). The trial court further ordered that PerfectaClene, Inc., d.b.a. ServiceMaster by Case should be joined as a party defendant. (*Id*.).

{¶39} On January 17, 2012, the MacDonalds and Owners filed cross-motions for summary judgment seeking a declaration by the trial court on the issue of insurance coverage. (Doc. Nos. 125, 127).

{¶40} On May 21, 2012, the trial court granted summary judgment in favor of the MacDonalds, declaring that the loss was covered under the Owners' insurance policy since Owners was equitably estopped from relying upon the vacancy exclusion due to the misrepresentations of Shawn Burden, its agent. (Doc. No. 149). The trial court certified its judgment to be a final, appealable order pursuant to Civ.R. 54(B). (*Id*.).

{¶41} On June 14, 2012, Owners filed a notice of appeal. (Doc. No. 155). Owners now appeals raising two assignments of error for our review. Since both of Owners' assignments of error raise similar issues, we will combine them for discussion.

**Assignment of Error No. I**

**The trial court erred by granting plaintiffs/appellees' motion for summary judgment because the doctrine of waiver (estoppel) cannot be employed to expand the coverage of a[n] [insurance] policy especially where the loss is excluded by the express terms of the insurance policy.** *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* **(1992), 64 Ohio St.3d 657, 668. Further, the court erred by granting plaintiffs/appellees' motion for summary judgment because there were multiple issues of material fact which precluded summary judgment in favor of plaintiffs/appellees and plaintiffs/appellees failed to prove that they relied upon alleged misrepresentations in good faith to their detriment. Finally, the issue of whether an insurer, by its words, actions, and conduct waived strict compliance with a policy provision is a jury issue.** *Thomas v. Nationwide Mut. Ins. Co.* **(2008), 177 Ohio App.3d 502, 2008-Ohio-3662. See, also, 58 Ohio Jurisprudence 3d Insurance § 753.**

**Assignment of Error No. II**

**The trial court erred in overruling the motion for summary judgment of defendant/appellant Auto-Owners Insurance Company, because the appellees admit that their commercial building was vacant for more than 60 days prior to the date of loss and therefore their claims for damages caused by water are expressly excluded under the Auto-Owners insurance policy.**

{¶42} In its first assignment of error, Owners initially argues that the trial court erred in granting summary judgment because the MacDonalds' commercial insurance policy unambiguously excludes water damage from coverage since the home was vacant for 60 days preceding the loss. Next, Owners argues that the doctrine of collateral estoppel cannot be used to expand the express terms of an insurance policy; particularly here when the MacDonalds failed to demonstrate

actual or constructive fraud. Owners additionally argues that whether or not the MacDonalds' reliance was reasonable and in good faith and whether or not Owners waived strict compliance with the vacancy provision are genuine issues of material fact precluding summary judgment. Finally, Owners argues that, even if it is estopped from denying coverage for work already completed under the doctrine of equitable estoppel, it should not be liable in equity for any repairs authorized after the MacDonalds had notice that the vacancy exclusion would defeat their insurance claim.

{¶43} In its second assignment of error, Owners argues that the trial court erred by failing to grant it summary judgment since the damages were excluded under the express terms of the insurance policy, particularly the 60-day vacancy provision.

{¶44} Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994). We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000).

{¶45} The insurance policy herein contains the following pertinent provision:

**6.    Vacancy**

If the building where the loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage, we will:

(a)    Not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(1)    Vandalism;

(2)    Sprinkler leakage, unless you have protected the system against freezing;

(3)    Building glass breakage;

(4)    Water damage;

(5)    Theft; or

(6)    Attempted theft.

(b)    Reduce the amount we would otherwise pay for the loss or damage by 15%.

A building is vacant when it does not contain enough business personal property to conduct customary operations.

Buildings under construction are not considered vacant.

(Joint Ex. 1, Pg. 203).    Since the MacDonalds do not dispute that the home was vacant for more than 60 consecutive days preceding the loss, there is no insurance coverage for water damage under the plain language of the policy.    Owners' argues that the trial court should have granted it summary judgment based upon

the aforementioned vacancy exclusion. However such a conclusion begs the question presented in this case: whether equitable estoppel can preclude Owners from enforcing the vacancy exclusion so that the MacDonalds have insurance coverage under the policy? Upon review of the applicable case law, we answer this inquiry in the affirmative.

{¶46} As Owners points out, generally "[w]aiver and estoppel are not available to bring within the coverage of an insurance policy risks not covered by its terms or expressly excluded therefrom," because "[a] company should not be obligated to cover a risk for which it did not contract." *Hartory v. State Auto. Mut. Ins. Co.*, 50 Ohio App.3d 1, 3 (11th Dist.1988), citing *Zechar v. All American Cas. Co.*, 116 Ohio App. 41 (2d Dist.1961); *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 668 (1992). Owners fails to acknowledge any of the exceptions courts in equity have created to this general rule, however. For example, this Court has found equitable estoppel applicable where an insurance company employee represented to the claimant that the insurance policy was in effect at the time of her husband's death; and, where a bank, as an agent for the insurance company, potentially made misleading factual statements which induced the couple to obtain the mortgage insurance in the first place. *Grimm v. USLife Credit Life Ins. Co.*, 3d Dist. No. 2-98-35, *6 (May 19, 1999). The Tenth District has found the doctrine applicable where an insurance agent informed the insured

that a medical facility was an approved provider under his medical policy, the insured took his daughter there for a month of treatment, and the insurance company subsequently denied coverage. *Duerler v. Community Mut. Ins.*, 10th Dist. No. 90AP-1337 (Apr. 18, 1997). While Owners' policy concerns have merit and the doctrine's application should be limited, "[a]n insurer should not be able to avoid liability under *all* circumstances in which it * * * induces another into changing his position based upon reliance on the insurer's conduct when the insured is prejudiced by such reliance." *Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co.*, 93 Ohio App.3d 292, 299 (9th Dist.1994) (emphasis added).

{¶47} "The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice." *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145 (1990). To that end, the Ohio Supreme Court has stated that equitable estoppel generally requires a showing of actual or constructive fraud. *State ex rel. Ryan v. Teachers Retirement Sys.*, 71 Ohio St.3d 362, 368 (1994). To constitute actual fraud, the wrongdoer must have intended to deceive or mislead another, i.e. possess a moral guilt. *Mason v. Moore*, 73 Ohio St. 275, 291 (1906). Constructive fraud, on the other hand, is "'a breach of a legal or equitable duty, which, irrespective of moral guilt * * *, the law declares fraudulent, because of its tendency to deceive others, to violate public or

private confidence, or to injure public interests.'" *Cohen v. Estate of Cohen*, 23 Ohio St.3d 90, 91 (1986), quoting *Stanley v. Sewell Coal Co.*, 285 S.E.2d 679, 683 (W.Va.1981). *See also Camp St. Mary's Assn. of W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes*, 176 Ohio App.3d 54, 2008-Ohio-1490, ¶ 22.

{¶48} To apply the doctrine of equitable estoppel the plaintiff must demonstrate four elements: (1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) induces actual reliance which is reasonable and in good faith; and (4) which causes detriment to the relying party. *Doe v. Blue Cross/Blue Shield of Ohio*, 79 Ohio App.3d 369, 379 (10th Dist.1992), citing *First Fed. S. & L. Assn. v. Perry's Landing, Inc.*, 11 Ohio App.3d 135, 145 (6th Dist.1983). *See also Doe v. Archdiocese of Cincinnati*, 116 Ohio St.3d 538, 2008-Ohio-67, ¶ 7, quoting *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn.*, 71 Ohio St.3d 26, 34 (1994). Relevant factors in assessing these four elements include:

> * * * [ (a) ] the nature of the representation; (b) whether the representation was in fact misleading; (c) the relative knowledge and experience of the parties; (d) whether the representation was made with the intent that it be relied upon; and (e) the reasonableness and good faith of the reliance, given all the facts and circumstances.

*Blue Cross/Blue Shield of Ohio*, 79 Ohio App.3d at 379.

{¶49} David Clark Prichard, MacDonald's son-in-law, testified that he met with Shawn Burden at the Spencerville home on June 25, 2010. (D. Prichard Depo. at 20). When David asked Shawn about what was going to happen, Shawn told him that he called someone to remove the water from the home, whom Shawn later introduced as Brad Case. (*Id*. at 24-26). After Shawn discussed the job with Case, he presented David with papers to sign, indicating that David's signature was necessary before any work could be done and assuring David that the work was covered under insurance. (*Id*. at 27-28, 33, 74). When asked why he signed the work authorizations, Prichard testified:

> I'm paraphrasing because I'm not sure it's exactly what [Burden] said, but he said here's the papers that we have to sign to get stuff started, and I said now, wait a second, I said before I sign these, this is not going to cost anything, right, and he said no, your father-in-law had great insurance, everything is covered, you don't have to worry about it.

(*Id*. at 28). Prichard further testified that he thought that he was only authorizing to remove the water from the home, and that Burden would obtain MacDonald's authorization for any additional work thereafter. (*Id*. at 54). Prichard testified that

he would not have signed the work authorizations absent Burden's representation that the work was covered by his father-in-law's insurance. (*Id*. at 82).

{¶50} Melissa Prichard testified that Shawn Burden told her husband, David, that the damage to the Spencerville home was covered under insurance. (M. Prichard Depo. at 21, 43, 89, 123). Melissa testified, in relevant part:

> Shawn Burden said that it was completely covered by the insurance policy that my father had on the home and that there would be no additional charges or any money would happen, additional charges to my father because it was all covered under his insurance policy, and my husband said I don't want to sign anything unless I know for sure that none of this is going out of, that this is going to affect my father-in-law in any financial way, and they assured him that it would not, and Brad Case was right there, so all of this was under the umbrella that we were moving in the direction with our covered insurance.

(*Id*. at 21-22). Melissa testified that Shawn never told David or her that there might be an issue with insurance coverage because the house was vacant. (*Id*. at 22). Melissa further testified that, when she called Shawn to express her concerns over the extent of the demolition occurring in the Spencerville home, Burden assured her that "the house would be restored to better condition than it was

previously" because her "dad had great insurance, he had Cadillac insurance." (*Id.* at 39, 123).

{¶51} MacDonald testified that, when he met with Shawn Burden to go over the damage at the house, Burden represented that the repairs would be covered under the insurance policy. (MacDonald Depo. at 70, 86, 88, 174); (MacDonald Depo. II at 37, 62, 65, 87, 94). When asked if he thought this representation was too good to be true, MacDonald testified:

> Well, I didn't realize, normally on insurance type things, and I don't
> have a lot of experience, the damage is there, you go out and get
> your own contractors, get competitive bids, submit them back to the
> insurance company and the adjuster administers that, and then they
> authorize you to go fix the damage at their cost, but in this case it
> was all being taken care of, [Burden] said don't worry about it, so I
> thought well, maybe you do this kind of thing on a major, instead of
> a $9,000 roof, this was going to be, you know, six figures or more so
> I walked away somewhat on cloud nine thinking well, I'm not like
> All State, in good hands, but in Auto-Owners' good hands.

(MacDonald Depo. at 71). MacDonald testified that his son-in-law, David, signed the work authorization because he thought the repairs were covered under insurance. (*Id.* at 171-173). MacDonald also testified that he did not suspect any

problems with insurance coverage until Alt from Owners Insurance called him in late August 2010 to get a formal statement concerning the loss. (*Id*. at 76-77). MacDonald testified that he was suspicious since Alt called him over 60 days after the loss, and the insurance company was still doing "busy work". (*Id*. at 77).

{¶52} Ken Burden, hired by ServiceMaster to do the demolition work at the MacDonald home, testified that Shawn Burden represented to Brad Case and him that the damage was a covered loss under the insurance policy. (K. Burden Depo. at 36). Ken also testified that he overheard Shawn tell MacDonald that the damage was covered under the insurance policy. (*Id*. at 37, 52, 120, 142).

{¶53} Deb Alt testified that the MacDonalds' insurance claim was fully assigned to Crawford, which meant that Crawford was supposed to verify insurance coverage, examine the damage, take photos, and submit reports for approval. (Alt. Depo. at 13-14). Alt testified that the MacDonald file sent to Crawford on June 24, 2010 clearly noted that the MacDonald policy was a commercial policy. (*Id*. at 17, 24). Alt testified that she called Burden on August 10, 2010 and told him that the MacDonalds' insurance policy was a commercial policy, which excluded coverage for water damage when the property was vacant for 60 days preceding the loss, as it had been here. (*Id*. at 30-31). Alt testified that Burden's response to this statement was silence, like he was catching his breath. (*Id*. at 30-32). Alt testified that during her investigation on behalf of Owners, she

learned that Darrell Hudson of Greg's Contracting overheard Clark or Melissa Prichard ask Burden whether or not there was insurance coverage. (*Id*. at 57).

{¶54} Shawn Burden testified that he never looked at the MacDonalds' insurance policy to verify that it was a homeowners' policy; but rather, he assumed it was a homeowners' policy because he grew up around the corner from the house and just continued to think of the property as a home. (Burden Depo. at 96, 242). Shawn testified that he knew the MacDonald family from his childhood, and Clark Prichard was his high school football coach. (*Id*. at 150). Shawn testified that his supervisor asked him to verify insurance coverage for the loss on June 29, 2010, which he failed to do. (*Id*. at 172-173). Shawn testified that he failed to exercise "due diligence" and made a "mistake" by failing to read the insurance policy to verify coverage. (*Id*. at 96-97, 154). Shawn testified that he "may have indicated" to Brad Case that he "did not see where this was not a covered loss," because the only question in his mind was whether or not the MacDonalds had mold coverage under their insurance policy. (*Id*. at 37). Shawn did not recall reassuring Clark Prichard that the loss was covered by insurance before Clark signed the work authorizations. (*Id*. at 44). Shawn testified that, when Melissa Prichard called him to discuss the extent of the demolition at the house, he told her that the demolition was necessary and that "they would replace stuff with, if it's plaster wall, they go back with plaster, unless you as a

homeowner choose to go back with drywall, but stuff gets put back how it was to its original state." (*Id*. at 67). Shawn testified that he also assured MacDonald that the house would be restored to its original condition. (*Id*. at 73-74). When asked why he made this representation, Shawn testified "[b]ecause at the time I had no reason to believe it was not a covered loss, and if it was a covered loss, their house would have to be put back in the same reasonable fashion that it was there." (*Id*. at 217). Nevertheless, Shawn denied telling the MacDonalds or the Prichards that the damage to the house was covered under their insurance policy. (*Id*. at 202).

{¶55} Upon review of the evidence, we cannot conclude that the trial court erred in determining that Owners should be equitably estopped from asserting the vacancy exclusion and by granting the MacDonalds' summary judgment. While Shawn Burden did not admit during his deposition that he expressly stated that the loss was covered under the insurance policy, his other representations and his conduct represented the same to all of the interested parties. Ken Burden, Shawn's own cousin, testified that Shawn represented to Brad Case and him that the damage was a covered loss under the insurance policy. (K. Burden Depo. at 36). Ken also testified that he overheard Shawn tell MacDonald that the damage was covered under the insurance policy. (*Id*. at 37, 52, 120, 142). Aside from that, Burden was contacting contractors, directing the repairs, and submitting

reports as if the insurance coverage, absent the mold issue, was already determined. Burden was Owners' agent acting with apparent authority to represent that the loss was covered under the insurance policy. Alt testified that it was Burden's duty to verify coverage under the insurance policy. (Alt Depo. at 13-14, 25, 49, 87). Burden never gave the interested parties any indication that he lacked the authority to determine insurance coverage.

**{¶56}** We reject Owners' arguments concerning the lack of fraud and the lack of good-faith reliance. Although this case does not involve actual fraud, the facts alleged rise to the level of a constructive fraud sufficient to trigger the doctrine of equitable estoppel. *Cohen*, 23 Ohio St.3d at 91 (1986). S*ee also Otterbein Homes*, 2008-Ohio-1490, at ¶ 22. Burden failed to exercise due diligence to verify insurance coverage under the MacDonalds' policy; but instead, assumed that the policy was a homeowners' policy. This failure gave rise to his representations that the loss was covered under the Owners' insurance policy, and the home would be repaired to its original condition. Pritchard and MacDonald reasonably relied upon Burden's representation that the loss was covered under their insurance policy prior to authorizing the repairs. Pritchard and MacDonald knew that Burden was hired by Owners to determine insurance coverage and adjust the insurance claim. Clark Pritchard testified that, prior to signing the work authorization, he asked Burden whether the loss was covered, and Burden assured

him it was covered under the insurance policy. Burden never indicated that Owners would have the final determination regarding coverage nor gave any reason to doubt his representation that the claim was covered. We agree with the trial court that this case presents one of those limited situations where the doctrine of equitable estoppel should apply to prevent the insurance company from denying coverage since the homeowners, through their agent Clark Prichard, reasonably relied upon the representations of Owners' agent, Shawn Burden, and proceeded with the repairs to the home, which is now substantially demolished and greatly diminished in value.

{¶57} As a final matter, Owners argues that it is inequitable to hold it responsible for repairs and remodeling costs subsequent to the date the MacDonalds had actual notice of the lack of insurance coverage. Owners relies upon the Tenth District's decision in *Duerler v. Community Mut. Ins.* to support its argument. 10th Dist. No. 90AP-1337. In that case, an employee of the Sports Medicine Grant Facility contacted the insurance company to determine if the facility was an approved provider under the insured's policy. *Id*. at * 1. Susan Hoard, an employee of the insurance company, confirmed that the facility was approved, so the insured took his daughter to the facility for treatment. *Id*. at * 1-2. After a month of treatment, the insurer denied the claims because it determined the facility was not approved. *Id*. Nevertheless, the insured continued taking his

daughter to the facility and filed suit for indemnification for the medical coverage. *Id*. at * 2. The insurance company agreed to pay the medical bills incurred prior to the denial of the facility's approved status. *Id*. The Court concluded that "it would be terribly inequitable to hold that defendant was not estopped from denying coverage up until the time plaintiff learned of the problem." *Id*. at *6.

**{¶58}** There is no indication in *Duerler*, however, that the daughter receiving treatment was left in a worse position after the treatment began. Here, the MacDonalds' home is severely damaged as a result of the demolition that occurred. There was some evidence that the demolition was excessive, and had the MacDonalds known about the lack of coverage, they probably would not have engaged in such extensive demolition and repairs. Denying coverage for the repairs on the home will not make the MacDonalds whole again—only repairing the damage will do that. Therefore, we reject Owners' argument to limit the equitable estoppel in this case.

**{¶59}** For the aforementioned reasons, Owners' first and second assignments of error are overruled.

**{¶60}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**WILLAMOWSKI and ROGERS, J.J., concur.**