FRANK D. CELEBREZZE, JR., J.:
{¶1} Plaintiff-appellant, Madora Jones ("appellant"), administrator of the estate of her late husband, ReDon Jones ("ReDon"), appeals (1) the trial court's denial of her motion for a mistrial, (2) the jury's verdict in favor of defendants-appellees, the Cleveland Clinic Foundation, et al. (collectively "appellees"), (3) the trial court's ruling limiting a witness' deposition testimony, and (4) the trial court's denial of appellant's motion to compel documents and motion for sanctions. After a thorough review of the record and law, this court reverses and remands.
I. Factual and Procedural History
{¶2} On June 25, 2012, appellant escorted ReDon to the emergency room at Hillcrest Hospital in Mayfield Heights, Ohio. For approximately one week prior to June 25, ReDon had been experiencing pains in the left side of his chest and appellant feared that ReDon was having a heart attack. While in the emergency room, ReDon was evaluated and an electrocardiogram ("EKG") was administered to determine a possible source of the chest pains. However, the EKG did not show any ST[1] elevations.
{¶3} The following day, June 26, after the emergency room evaluations, ReDon was transferred to an observation area (known as the clinical division unit) where he continued to complain about chest pains. Here, a physician, Dr. Avrum Jacobs ("Dr. Jacobs") evaluated ReDon and, after completing his evaluation, Dr. Jacobs discharged ReDon. Dr. Jacobs had concluded that ReDon had experienced "chest pain of unknown [origin], with no evidence of acute coronary syndrome."[2]
*493 {¶4} The following day, June 27, ReDon had a follow-up appointment with Dr. Jacobs. At this follow-up appointment, Dr. Jacobs had originally intended to perform a nuclear stress test, however, because of ReDon's claustrophobia, this particular test was not administered. At this time, no further testing was performed on ReDon. Dr. Jacobs had him return a week later, on July 2, for another test, a stress echo test.
{¶5} On July 9, 2012, appellant had apparently planned to take ReDon back to the emergency room at Hillcrest Hospital because ReDon continued to experience chest pains. On the morning of July 9, ReDon suffered a heart attack at the family home. ReDon was transported by ambulance to Hillcrest Hospital but, tragically, he was pronounced dead after being transported to Hillcrest.
{¶6} On April 12, 2016, appellant filed a wrongful death and medical malpractice claim against appellees.
{¶7} The matter eventually proceeded to a jury trial on Monday, October 30, 2017. Closing arguments and the jury charge were presented Friday morning, November 3, 2017.
{¶8} The trial court provided the following instructions to the jury concerning its deliberations, which are significant to the instant appeal:
Consult with one another in the jury room, and deliberate with a view of reaching an agreement if you can do so without disturbing your individual judgment.
(Tr. 973.)
It will be the duty of the jury to render, in writing, a general verdict. You will be given, and you heard this in closing arguments, questions called interrogatories. You must answer them in writing starting with the first question.
You must carefully follow the instructions on how to proceed because the directions will tell you which questions to answer, and whether to sign the general verdict for [appellant] or [appellees].
A question is answered when at least six of the jurors agree. All who agree must sign the verdict form. If six jurors cannot agree on an answer, you will be instructed to report to the Court.
(Tr. 974-975.)
If you are unable to reach a decision or an answer to whatever that question may be, the foreperson can write it out. Hit that white button. Don't ask [the bailiff] anything. Just hand him the note. I'll gather the lawyers together, and I'll answer the question if I can; okay?
(Tr. 979.) Prior to dismissing the jury for deliberations, the trial court dismissed two alternate jurors who had sat on the jury for the duration of the trial. The trial court then dismissed the jury, and the jury began its deliberations at approximately 11:00 a.m.
{¶9} At approximately 12:30 p.m., the jury wrote a note to the trial court stating:
What is the definition of standard of care? Is it for all patients or is it individualized based on patients? We are strongly split down the middle. What should we do? Why can't we see the publications presented by the defense?
The trial court then discussed these questions with trial counsel and advised the jury as follows: "You have all the evidence in this trial. Please re-read the jury instructions. Continue your deliberations." Thereafter, at 1:00 p.m., the jury was dismissed for lunch. Deliberations continued after lunch at 2:15 p.m.
{¶10} At 5:00 p.m., the jury wrote a second note to the trial court stating, "we are still undecided 4-4. What should we *494 do?" After again discussing the note with trial counsel, the trial court responded at approximately 5:20 p.m. stating, "keep deliberating."
{¶11} Some time after this second note, the trial court received a third note from the jury which stated, "[o]ne of the jurors states that he is getting calls about an urgent matter with his family. What should we do? A juror # 3 is requesting to leave. What should we do?" The trial court then sent a note back to the jury inquiring as to the nature of the urgent matter. After receiving the jury's response, the trial court then sent a letter to the jury asking "[d]o you want to continue to deliberate tonight if juror # 3 has to go?" The jury responded "yes." At approximately 7:00 p.m., the following exchange was then had on the record:
THE COURT: We're back on the record * * * The jury has been deliberating since about 11:00 this morning. We received an email - or a note from Juror No. 3 who had a family emergency. And, specifically, the parties agreed for me to inquire about the emergency. The emergency is that his grandmother fell and was rushed to the hospital, and his mother wants all the family members gathered at the hospital because of this fall. Then I inquired to say, "[d]o I let the jury go home, or do they want to continue to deliberate?" With all parties' permission, I inquired to the jury that question, and the question is, "[d]o you want to continue to deliberate if Juror No. 3 has to go?" And they responded, "[y]es." So with that being said, I'm going to allow this jury to continue their deliberations, and I'm going to replace Juror No. 3 with alternate No. 1. And I put that on the record to ask if there is any objection to that by [appellant]?
[Appellant's counsel]: No, but I think that you misspoke. You said you're going to let the jury deliberate. They will have to restart their deliberations.
THE COURT: I'm going to bring in the jury, tell them to begin their deliberations anew with alternate 1 as Juror No. 3. I'm going to have [the bailiff] take the interrogatories and verdict forms from them, and I have a fresh new copy of those to give to the jury. I'm sorry. Any objection to that, [appellant's counsel]?
[Appellant's counsel]: No, your Honor. I wanted the record to be clear.
THE COURT: You got it. [Appellees' counsel?]
[Appellees' counsel]: Yes, your Honor. On behalf of [appellees], we do object to doing this. Our concern is that the jury has been deliberating for over seven hours today. This group has been working diligently, quite diligently, to get this done. It is now quarter after seven in the evening. Our concern is they're going to have to restart deliberations. That means the likelihood of them actually completing deliberations tonight is small. They are likely to have to come back and reconvene on another day, whether that is tomorrow or Monday. I think we should wait until Monday, or Saturday, or Monday to see if Juror's No. 3 problem has resolved before making a substitution.
THE COURT: I do recall during the jury selection process a few of the jurors were adamant to try to get this done by Monday. That is why I asked this question if they wanted to continue to deliberate even if No. 3 has to go. With that being said I'm going to, over [appellees'] objection, replace Juror No. 3 with alternate No. 1, and bring them in and do that formally, and tell them to begin their deliberations anew. With that being said, bring in the jury.
(Tr. 983-985.) The trial court then called the jury into the court room, dismissed *495 Juror No. 3, and declared alternate Juror No. 1 as new Juror No. 3.
{¶12} Approximately one hour after dismissing Juror No. 3, the trial court received a fourth note from the jury stating "[w]e are deadlocked at 50/50. Everyone is very strong in their decision and are not swaying based on the evidence. How long do we have to stay here tonight?" The trial court discussed the note with trial counsel and responded to the jury "keep deliberating."
{¶13} Approximately one hour later, some time after 9:00 p.m., the jury wrote a fifth note to the trial court which stated:
We are deadlocked at 50/50. Everyone is very strong in their decision and are not swaying based on the evidence. How long do we have to stay here tonight? Can we go home? We are tired, cranky, and see no change in our opinions, based on the evidence in the foreseeable future.
At this point, the trial court instructed the bailiff to inform the jury that they were to come back Monday morning to continue to deliberate. The bailiff delivered this message to the jury, and some of the jurors said to the bailiff "come back for what? We aren't agreeing." While the bailiff was delivering this message to the jury, the trial court and trial counsel were conferring as to the appropriate time to deliver a Howard[3] charge. Approximately fifteen minutes after the exchange between the jury and the bailiff, the jury informed the trial court that they had reached a verdict.
{¶14} Thereafter, and prior to reading the verdict, the trial court and trial counsel had the following exchange:
THE COURT: I want to make a record of what transpired before we take this verdict. It's now, according to my clock, 10:15 [p.m.]
[Appellees' counsel]: Almost.
THE COURT: Almost 10:15 [p.m.] The jury has been deliberating for almost 11 hours; is that correct? We received communication probably - I wish I had the notes, but probably around 9:30, 9:45 - 9:30 would you say?
[Appellees' counsel]: Last communication?
THE COURT: Yeah.
[Appellees' counsel]: Probably about that.
THE COURT: 9:30 [p.m.] And the note, which will be preserved for the record to the court reporter, was that they were 50/50 unable to reach a verdict and unable to decide this. And that they were tired, cranky, and they want to go home. The [c]ourt sent back a note to the jury indicating to them, [o]kay. You can go home. I'll see you Monday at 8:30 [a.m.] to continue your deliberations. The jury responded to that note saying, [w]ell, we might as well stay and deliberate, and nothing will change, I think is the exact words that we got; is that correct?
[Appellees' counsel]: I don't remember what the exact words were.
THE COURT: I think "might as well stay."
THE BAILIFF: The note, I believe, said, "[y]ou can go home and come back 8:30 [a.m.] Monday." They read the note, and a couple of them said, "[c]ome back for what? We're not going to change."
[Appellees' counsel]: A couple of them said that, but there was no note.
THE COURT: No, no note. A couple of them said after [the bailiff] delivered the note, "[w]ell, nothing will change." This [c]ourt had the parties in my office, and we were going to read the deadlocked charge authored in [the Ohio Jury Instructions]
*496 31.907 to the jury. And we were debating when to read that to them.
And then about 15 minutes ago, which would have been 10:00 [p.m.], they reached - they hit the buzzer again and said they had reached a verdict. Did I correctly and accurately describe what happened, [appellant? Appellees]?
[Appellees' counsel]: I can't represent all the times were accurate.
[Appellant's counsel]: Right.
[Appellees' counsel]: But the course of events were generally accurate. I'm getting tired, too.
THE COURT: I got you. So I am.
[Appellant's counsel]: I'm not sure there was as much time between telling them to stay and then coming back for the verdict, but that is the sequence of events.
THE COURT: I want to make a record of just what transpired. We will have all of those notes preserved for the record and everything. Very good. Let's bring in the jury.
(Tr. 989-991.)
{¶15} The trial court brought the jury into the courtroom to read the verdict. The trial court then noticed an error in the jury's answers to the interrogatories, and the trial court dismissed the jury to correct this error. While awaiting the jury's corrections, the following exchange occurred:
[Appellant's counsel]: Yeah. I don't think we should accept the verdict from the jury because of the circumstances involved in the case; that they said they were tired, they were cranky, and the [trial court] said they wanted to go home.
The [trial court] told them they could go home and they would report back Monday, and the response was then, in that case, they would stay. And a very short time later, 15, 20 minutes later, they said that they had a verdict.
So the verdict seems to be based on the fact that they didn't want to stay any longer because they were tired, cranky, and cold - and it is pretty cold in here - and they didn't want to come back on Monday. I don't think either side probably wants a decision based on that.
THE COURT: [Appellees' counsel].
[Appellees' counsel]: First, it was [my] suggestion when there was the issue with Juror No. 3 that we allow the jurors to go home for the weekend. We had already had information they were struggling to reach a consensus for this verdict. [Appellant's] counsel objected to that.
The final understanding and agreement was to have the jury continue to deliberate. A juror was substituted for No. 3, again over [my] objection. The jury went back to deliberate. When we learned through their communications with the [trial] [c]ourt that they were having trouble still coming to a verdict, it was the agreement of all the parties and the [c]ourt at that time that the jury should continue to deliberate.
At no time did [appellant's] counsel indicate that he thought the better course of action would be to allow the jury to go home, rest over the weekend, and have some time to consider things and come back on Monday morning. In fact, that was my suggestion which was not agreed to by [appellant's counsel].
I don't know where [appellant's counsel] gets that this jury's verdict, whatever it is, is invalid. And it certainly isn't because it's too cold in here. It is the same temperature this courtroom has been all week, and they have not complained about it being cold.
*497 There is no reason to make any assumptions about the jury verdict. After their last communication, a half hour or so of additional deliberation, that's what we all agreed to have them do.
For [appellant's counsel] now to complain that we tested their patience before they came to a verdict is because he's making the assumption, if anything, that this is going to be an adverse verdict to [appellant] in this case. That is the only reason [appellant's counsel] now decides that he needs to object.
Again, I want to point out one last time, it was my suggestion, hours ago, that we send this jury home, let them rest, reconsider things over the weekend, and come back on Monday morning. [Appellant's counsel], on behalf of [appellant], objected to that.
[Appellant's counsel]: Can I respond? I can speak for myself. I don't need [appellees' counsel].
First of all, there are several inaccuracies. One thing; I did not object to sending the jury home. The decision was made we would allow the jury, if they wanted to stay and deliberate without Juror No. 3, and they indicated that they did. So that's what happened, and that is why the alternate was put on.
Second of all, at the time - there was no agreement - [w]hat happened was the jury was told that they could go home, and that they would report back Monday. The bailiff delivered that message to the jury.
THE COURT: Through a note.
[Appellant's counsel]: And the jury then said they would stay. There was no agreement or anything. There was no action on anybody's part. They said they would stay.
And we were in chambers discussing sending them home and reading the [ Howard ] charge before they went home tonight, or when they returned on Monday, when they came back that they had a verdict. That was the sequence of events.
So at the time this came back, we all were agreement we were sending them home and coming back Monday and discussing when we would read the [ Howard ] charge.
[Appellees' counsel]: No. First of all, I did make a record when there was the substitution of the juror that I objected to it. My suggestion was that we send the jurors home, have them back on Monday, see what Juror's No. 3 situation was, and then decide whether or not the substitution was necessary to have them restart deliberations. There is a record on that.
(Tr. 992-996.) Thereafter, the jury returned to the courtroom and returned a verdict of 6-2 in favor of appellees.
{¶16} On Monday, November 6, 2017, appellant filed a motion for a mistrial. On November 13, 2017, appellees filed a brief in opposition to appellant's motion for mistrial. Appellant filed a reply brief on November 17, 2017. While the motion for a mistrial was pending, on December 12, 2017, the trial court held a hearing because it had received a letter from a juror. The trial court read the entirety of the letter on the record, however, we include the following relevant portions:
Friday, after closing arguments, we were asked to begin deliberating at about 10 am. I was so convinced of my vote for the plaintiff that I was amazed there were as many for the defendant in the case when we initially explained our vote and realized we were split down the middle. We all tried to be open to other sides arguments and even spent a good deal of time going back through the evidence to see if one side had missed *498 something that would change anyone's vote on either side. We did this for hours to much frustration by most of us. I felt we were given very little guidance as to how long this would go on and that was maddening. I felt like I was being worn down and began to feel a bit inhuman and trapped. As you may remember, one of the jurors at about 8 pm that evening was dismissed for a family emergency. I am quite sure as were others on the jury that he made up that story because he needed to get home and saw no other way. I do not believe he should have done that but I understand why he did. And this brings me to the most upsetting and distressful part of my story.
As I mentioned, I felt very strongly that the plaintiff was correct in this case and the defendant was negligent. Yet in the end, to speed the process along, I and one other juror changed ou[r] votes as the hour approached 11 pm now I have to live with that decision which went against what I believed was right. I am ashamed and have tears in my eyes even as I type those words to you over a week later. I compromised my integrity and my belief so we could be finished. That was wrong. Should I have done that? Absolutely not. Was it the right thing to do? I now know it was not. Did anyone try to change my mind? No, they did not and that makes me sad. But I believe it was because we were all relieved it would be over sooner. And that is really disturbing.
After the trial and despite the crazy late hour, you met with all of us and reassured us it was indeed a tough case. But I believe it should have ended differently and would have if we had been better informed about what the next steps would be and when they would happen. Let me explain. We were definitely headed toward becoming a hung jury. There were four on either side of the issue (even after the alternate was brought in to deliberate) who each felt very strongly about their decision. But we had no idea how long we would be asked to stay. We were tired and frustrated but thought we could end up being back on Monday and long into the next week. No one wanted to come back. No one felt anyone's mind would be changed the longer we stayed. But I believe I would not have "caved" had I known we would only be asked to come back Monday. And that is what you indicated when you spoke with us after the trial. That made me feel even worse about what I did. I would have been willing to sacrifice my Monday had I known I could have kept my integrity and my vote intact. But now I have to live with what I did. And it feels awful.
* * * If there was any way we could have not been kept there so late Friday or if we could have been given options or if we were told we would come back Monday but that would likely be the only extra day, maybe things would have played out differently.
{¶17} On March 16, 2018, the trial court issued a journal entry and opinion denying appellant's motion for a mistrial. It is from that judgment, and the jury's verdict, that appellant brings the instant appeal assigning four errors for our review:
I. The trial court erred to the prejudice of [appellant] in failing to declare a mistrial when one of more jurors abandoned their strongly held beliefs regarding the weight and effect of the evidence merely for the purpose of returning a verdict and avoiding additional jury deliberations.
II. The jury's verdict in favor of [appellees] was against the manifest weight of the evidence.
*499 III. The trial court erred to the undue prejudice of [appellant] in precluding [appellant's] full use at trial of the rule 30(B)(5) deposition testimony of [appellee].
IV. The trial court erred in failing to grant [appellant's] motion to compel production of [appellees'] hospital policies, procedures, and protocols, and to award appropriate sanctions against [appellees] thereby depriving [appellant] of a fair trial.
II. Law and Analysis
A. Mistrial
{¶18} In appellant's first assignment of error, she argues that the trial court erred in denying her motion for a mistrial. Appellant also argues that the trial court should have sua sponte declared a mistrial after the jury expressed that they were deadlocked. Lastly, appellant argues that the trial court erred by not providing a Howard charge to the jury after they had expressed that they were deadlocked.
{¶19} First, appellant argues that the trial court erred when it denied her motion for a mistrial. We note, as did the trial court, that although appellant had specifically requested the trial court to declare a "mistrial," such a motion would be more properly characterized as a motion for a new trial pursuant to Civ.R. 59.
" 'While the granting or denying of a mistrial rests within the sound discretion of the trial court, * * * this rule of law appears to apply almost exclusively to criminal cases. Although several courts have proclaimed that the misconduct of counsel, because of its influence on the jury, may be grounds for a mistrial in a civil action, * * * a review of the Ohio Civil Rules fails to offer any authority which empowers a court to grant a mistrial in a civil case.' Judges have treated a motion for a mistrial in civil cases as a motion for a new trial under Civ.R. 59, and we do so here."
Ridley v. Fed. Express , 8th Dist. Cuyahoga No. 82904, 2004-Ohio-2543, 2004 WL 1119591, ¶ 42, quoting Hampton v. St. Michael Hosp. , 8th Dist. Cuyahoga No. 81009, 2003-Ohio-1828, 2003 WL 1848772, ¶ 29, quoting Settles v. Overpeck Trucking Co. , 12th Dist. Butler No. CA90-05-094, 1991 WL 164580 (Aug. 26, 1991).
{¶20} Pursuant to Civ.R. 59, a litigant may challenge a verdict on any one of ten grounds. Applicable to the instant matter is Civ.R. 59(A)(1) and (2), which provide a new trial when a movant has demonstrated
(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having fair trial;
(2) Misconduct of the jury or prevailing party[.]
{¶21} Therefore, this court reviews a trial court's decision on a motion for a new trial for an abuse of discretion where the argument addresses an issue that is within the trial court's discretion. Robinson v. Turoczy Bonding Co. , 8th Dist. Cuyahoga No. 103787, 2016-Ohio-7397, 2016 WL 6139588, ¶ 23. A trial court's decision that is arbitrary, unconscionable, or unreasonable signifies an abuse of discretion. Blakemore v. Blakemore , 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).
1. Appellant's Motion for a Mistrial
{¶22} In her motion for a mistrial, appellant urged the trial court to declare a mistrial "based upon the circumstances of the jury deliberations" and pursuant to R.C. 2315.05.
{¶23} In her motion, appellant argued that the "jurors surrendered their honest *500 opinion as to the weight of the evidence for the mere purpose of returning verdict and going home." Appellant further argued that the jury's verdict was the result of the jury believing it was being forced to either return a verdict Friday night or be forced to return for further deliberations on Monday. To this end, appellant argued that the trial court impliedly coerced the jury into reaching a verdict.
{¶24} First, we note that appellant's arguments relative to R.C. 2315.05 are not applicable given the procedural posture of the instant matter. R.C. 2315.05 provides in full:
Because of the sickness of a juror, or an accident or calamity which requires it, or with the consent of both parties, or after jurors have been kept together until it satisfactorily appears that there is no probability of their agreeing, the court may discharge the jury.
In the instant matter, the jury submitted its verdict on Friday, November 3 and was dismissed that night. On the following Monday, November 6, appellant filed her motion for a mistrial. Therefore, the trial court was not able to retroactively discharge the jury pursuant to R.C. 2315.05, and the trial court was not able to grant appellant relief pursuant to R.C. 2315.05. Similarly, we are not able to grant appellant relief pursuant to R.C. 2315.05.
{¶25} In support of her argument that the trial court erred in denying her motion for a mistrial, appellant directs our attention to State v. Sabbah , 13 Ohio App.3d 124, 468 N.E.2d 718 (6th Dist.1982). Sabbah was charged with murder, claimed self-defense, and the case proceeded to a jury trial. After approximately 45 minutes of deliberations, the jury requested a rereading of the self-defense jury instructions. Thereafter, approximately three hours later, the jury submitted the following note to the trial court
After two votes we are deadlocked at six and six. We feel that the case has been bungled by both the police, defense, the prosecutor's office; that we have insufficient evidence upon which to base a judgment. There are too many loopholes in both sides of the evidence. We do not feel we could be fair in either verdict.
Id. at 138, 468 N.E.2d 718. After reading the note into the record, the trial court stated:
Now ladies and gentlemen, there is no more evidence that can be presented to you. Both sides have presented what they felt was the relevant evidence in the case.
And presumably this Jury, a good hardworking Jury, can reach a verdict if any jury can.
I would like you to go back and to discuss and decide whether or not you feel with more time - not necessarily tonight - it could be either tomorrow or Monday - there would be a likelihood of reaching a verdict. And, of course, you realize a verdict must be unanimous, twelve. And then please report back to the Court what your position is.
Id. Approximately 90 minutes after the trial court gave this instruction, the jury returned a verdict of guilty. Sabbah did not orally request a mistrial and did not file a motion for a mistrial in the trial court.
{¶26} On appeal, Sabbah argued that the trial court should have sua sponte declared a mistrial. The Sixth District agreed and reversed Sabbah's conviction. In reaching this decision, the court noted the unique facts, and in particular, noted that the trial court instructed the jury to continue deliberations even after the jury had clearly expressed their inability to decide the case fairly. The Sixth District stated:
The jury's note to the trial court revealed more than simply a difficulty in *501 arriving at a verdict. This was not a case where the intransigence of a single juror frustrated the unanimity of a verdict. Reasonable doubt was clearly pervasive in the minds of six members of the jury. Standing alone, this fact should have alerted the trial court that it faced circumstances ladened with coercive potential. Juries generally do not and, of course, should not, disclose the status of their deliberations in messages to the court. Second, the jury declared that it had insufficient evidence upon which to base a verdict. It then substantiated its collective opinion of the evidence with the statement that "there are too many loopholes in both sides of the evidence." Finally, the jurors clearly and explicitly announced that any verdict they might reach would not be fair. No leap of faith is needed to see that any subsequent verdict thus rendered would be, by their own protestations, an unfair one.
(Emphasis sic.) Id. at 138-139, 468 N.E.2d 718.
{¶27} Furthermore, the court found that
The jury's explicit, unequivocal indication (1) that it was evenly deadlocked after a substantial period of deliberation, (2) that it lacked sufficient evidence to reach a verdict, and (3) that any verdict it might reach would be unfair are the attendant, aggravating circumstances needed to find that the jury's subsequent verdict was unduly coerced. The jury's note presented adequate indicia of its inability, not only to reach a verdict, but to reach a verdict which, in its opinion, would be fair to both parties. Hence, the court should have, sua sponte, declared a mistrial and discharged the jurors. Its failure to do so was prejudicial error.
Id. at 139, 468 N.E.2d 718.
{¶28} First, in the instant matter, the plain reading of the jury's notes collectively indicates that the jury was deadlocked. The juror's letter further confirms the irreconcilable aspect of their deadlock. However, within the jury's notes, there was no indication that the jury lacked sufficient evidence to reach a verdict or was unable to be fair in its decision. Therefore, the jury's notes in the instant matter are distinguishable from Sabbah . Accordingly, to the extent that appellant contends that the trial court should have, sua sponte , declared a mistrial, we do not agree.
{¶29} We do, however, find that the trial court abused its discretion when it denied appellant's motion for a mistrial. Notwithstanding the juror's letter, given the totality of the circumstances surrounding the jury's deliberations, the trial court's denial of appellant's motion for a mistrial was an abuse of discretion. The jury communicated on several occasions that they were deadlocked. Upon being instructed that they would have to return Monday morning to continue with their deliberations, the jury broke a previously unbreakable deadlock and returned a verdict some 15 minutes later. Based on these facts, we find that the trial court abused its discretion in denying appellant's motion for a mistrial.
{¶30} With regards to the juror's letter, we find that this provides even more support for granting appellant's motion for a mistrial. The juror's letter describes that the juror, and another juror, changed their votes for the sake of simply concluding deliberations. Equally troubling, the letter details that this particular juror was confused as to what was expected of the jury's deliberation schedule: or - whether the jurors would be required to stay throughout the evening or whether they would be required to return Monday morning. This letter also reiterates that several members *502 of the jury were confused why they would have to return on Monday because they were deadlocked. In sum, the juror's letter clearly and painfully communicates that the verdict reached by the jury was not fair, similar to the jury's verdict in Sabbah .
{¶31} Perhaps the jury assumed that replacing Juror No. 3 with an alternate juror would break the deadlock. However, the deadlock was not broken by the new juror, indeed the deadlock continued. In this regard, the inclusion of the alternate juror did not reset the deadlock. We considered each and every communication of a deadlock and so should have the trial court. We based this opinion solely on the unique facts and circumstances in this case.
{¶32} Lastly, to the extent that the trial court relied upon Evid.R. 606(B) in finding that the juror's letter was not credible evidence, we disagree with this analysis.
{¶33} Evid.R. 606(B) states
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying will not be received for these purposes.
{¶34} We note that "[a] firmly established common-law rule flatly prohibits the admission of juror testimony to impeach a jury verdict." State v. Hessler , 90 Ohio St.3d 108, 123, 734 N.E.2d 1237 (2000), citing State v. Robb , 88 Ohio St.3d 59, 79, 723 N.E.2d 1019 (2000). This common-law principle, known as the "aliunde rule," is incorporated in Evid.R. 606(B), which governs the competency of a juror to testify at a subsequent proceeding concerning the original verdict. Id.
{¶35} In the instant matter, the juror who wrote the letter did not testify at a subsequent proceeding concerning the original verdict. See id. Therefore, Evid.R. 606(B) is wholly inapplicable to this case.
2. Howard Charge
{¶36} Within appellant's first assignment of error, appellant also argues that the trial court erred in not giving a Howard charge to the jury. Howard , 42 Ohio St.3d at 24, 537 N.E.2d 188. Although not dispositive as to our resolution of appellant's first assignment of error, given these unique facts before us, we feel compelled to discuss appellant's arguments.
{¶37} The Howard charge states that
The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others.
*503 You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.
Howard at paragraph two of the syllabus.
{¶38} "Where it appears to a trial court that a jury is incapable of reaching a consensus, the court, in its discretion, may make a last-ditch effort to prod the jury into reaching a unanimous verdict so long as its instructions are balanced, neutral, and not coercive." State v. King , 8th Dist. Cuyahoga No. 99319, 2013-Ohio-4791, 2013 WL 5886605, ¶ 24, citing Howard at 24, 537 N.E.2d 188. "[T]he determination of whether a jury is irreconcilably deadlocked is within the discretion of the trial court." Id. at ¶ 25, citing State v. Gapen , 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 127. Moreover, "there is no bright-line test to determine what constitutes an irreconcilably deadlocked jury." King at ¶ 26. "There is no formula or required period of time a trial court must wait before issuing a Howard instruction." (Citations omitted.) Id. See also State v. May , 2015-Ohio-4275, 49 N.E.3d 736, ¶ 55 (8th Dist.) (where this court found that the trial court did not abuse its discretion or did not commit plain error "in giving a supplemental Howard instruction at 4:30 p.m. rather than the following morning").
{¶39} Appellant did not, however, explicitly request that the trial court administer a Howard charge. Although, we can discern that the parties discussed off the record whether a Howard charge should be administered and at what time it should have been given (either Friday evening or Monday morning), we cannot discern that appellant explicitly requested that a Howard charge be given, much less objected to the trial court's refusal to give a Howard charge.
{¶40} As such, because appellant did not request a Howard charge or object to a Howard charge having not been given, appellant has forfeited all but plain error. In State v. Morgan , 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784, ¶ 40, the Ohio Supreme Court outlined plain error in the civil context.
[I]n order for a court to find plain error in a civil case, an appellant must establish (1) a deviation from a legal rule, (2) that the error was obvious, and (3) that the error affected the basic fairness, integrity, or public reputation of the judicial process, and therefore challenged the legitimacy of the underlying judicial process. [ Goldfuss v. Davidson , 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997) ]. As when they apply criminal plain-error review, reviewing courts applying civil plain-error review "must proceed with *504 the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice." Id. at 121 [679 N.E.2d 1099].
{¶41} This court previously upheld the issuance of a Howard charge where the jury indicated through three communications that they were deadlocked. State v. Morgan , 8th Dist. Cuyahoga No. 97934, 2012-Ohio-4937, 2012 WL 5266422. In Morgan , the defendant appealed his conviction and argued that the trial court's issuance of the Howard charge was plain error because the charge was unnecessary and unwarranted. This court noted that the jury had been deliberating for a full day and a half. Furthermore, this court noted that the statements from the jury indicated "that deliberations were becoming uncomfortable," and that the jury was "merely rehashing the same arguments over and over." Id. at ¶ 21. From this evidence, this court held that "the trial court could properly determine that the jury was deadlocked." Id.
{¶42} As noted above, the jury communicated to the trial court on several occasions that it was deadlocked. The first note occurred prior to the jury being dismissed for lunch, a little more than one hour after commencing deliberations. Then, approximately five hours after the first note, the jury communicated again that they were deadlocked. The trial court's failure to administer a Howard charge after receiving the second note was arguably plain error.
{¶43} Notwithstanding, the trial court's failure to administer a Howard charge after the jury communicated a third and fourth time that it was deadlocked was undeniably plain error. At around 8:00 p.m., approximately nine hours after commencing deliberations, and after dismissing Juror No. 3, the jury communicated that they were deadlocked for a third time. Then again, shortly past 9:00 p.m., the jury communicated a fourth time that it was deadlocked. We find that a Howard charge should have been administered after the third communication of a deadlock. Lastly, the fact that when the jury wrote the third note, previous Juror No. 3 had been replaced, does not affect our analysis. Regardless of Juror No. 3 having been replaced, the third note was the third communication of a deadlock. We therefore find plain error in not administering a Howard charge after the third note.
{¶44} Based on the above analysis, we find that the trial court abused its discretion when it denied appellant's motion for a mistrial. We further find that the trial court's failure to provide a Howard charge after receiving the third and fourth communication of a deadlock was plain error.
{¶45} Accordingly, appellant's first assignment of error is sustained.
B. Civ.R. 30(B)(5)
{¶46} In appellant's third assignment of error, she argues that the trial court erred when it ruled that the testimony of Stacy Kachline, R.D.C.S.,[4] ("Kachline"), appellees' Civ.R. 30(B)(5) designated witness, would be limited.
{¶47} An appellate court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard. State v. Gale , 8th Dist. Cuyahoga No. 94872, 2011-Ohio-1236, 2011 WL 915805, ¶ 12, citing State v. Finnerty , 45 Ohio St.3d 104, 107, 543 N.E.2d 1233 (1989).
{¶48} During the discovery process, appellant filed a "notice of videotape deposition *505 pursuant to [Civ.R.] 30(B)(5) duces tecum." Kachline was designated by appellees in compliance with Civ.R. 30(B)(5) to testify on behalf of the Cleveland Clinic to the designated matters within appellant's Civ.R. 30(B)(5) discovery notice. Civ.R. 30(B)(5) states, in relevant part:
A party, in the party's notice [of deposition examination], may name as the deponent a public or private corporation, a partnership, or an association and designate with reasonable particularity the matters on which examination is requested. The organization so named shall choose one or more of its proper employees, officers, agents, or other persons duly authorized to testify on its behalf. The persons so designated shall testify as to matters known or available to the organization.
{¶49} Under Civ.R. 32(A)(2), a deposition taken pursuant to Civ.R. 30(B)(5) may be used at trial for any purpose. Further, "[t]he 1970 staff notes to Civ.R. 32(A)(2) indicate that 'a party may use the deposition of an adverse party or the persons enumerated in Rule 30(B)(5) not only for impeachment purposes, but also as substantive evidence.' " Thomas v. Nationwide Mut. Ins. Co. , 177 Ohio App.3d 502, 2008-Ohio-3662, 895 N.E.2d 217, ¶ 133 (8th Dist.).
{¶50} A week prior to the jury trial, appellees filed a motion in limine seeking to "preclud[e] [appellant's] counsel from attempting to elicit medical opinions from the non-physician witnesses that will be called to testify at trial, including but not limited to [Kachline] * * * [.]" Appellees filed this motion anticipating that appellant's counsel "may attempt to elicit incompetent opinions" from these witnesses and "any opinions from non-physicians relative to medical issues would not meet the Evid.R. 702 [expert witness testimony] requirements."
{¶51} At trial, appellant attempted to have Kachline's deposition testimony read into the record as part of her case in chief. The trial court ruled to limit Kachline's deposition testimony and noted:
[Kachline] was designated as a 30(B)(5) witness concerning performance of the diagnostic tests. She can testify concerning The Clinic's requirements and standards performing the test; and, obviously, she can get up to say that the gold standard, or whatever it was, was 85.
* * *
However, [Kachline] cannot testify as to the validity of the diagnostic value of any of the tests. Which means that rendering a medical opinion goes beyond the 30(B)(5) designation. An examination of the test results and their value is within the province of a medical expert for both [appellant] and [appellees], not a 30(B)(5) witness on conducting the test.
(Tr. 208.) Presumably, because of the trial court's ruling, Kachline's deposition testimony was not presented by appellant at trial.
{¶52} Appellant sought to introduce portions of Kachline's deposition testimony concerning a stress echocardiography[5] ("stress test") that was performed on ReDon at Hillcrest Hospital. The purpose of this stress test is to determine how well a patient's heart is working.
{¶53} According to the Cleveland Clinic standards, if a patient obtained a maximum heart rate of 85%, the stress test *506 would then be considered diagnostic; i.e., the stress test could be used for diagnosing purposes. Appellant sought to introduce portions of Kachline's deposition testimony stating that an individual's stress test target rate is 85%. Further, appellant sought to introduce Kachline's statements that the Cleveland Clinic's rule is if a patient does not obtain the 85% target rate, the stress test is not diagnostic. Appellant contends that Kachline's deposition testimony was admissible under Civ.R. 30(B)(5).
{¶54} Appellees concede that Kachline's deposition testimony could include the simple fact that the target rate is 85%. However, appellees argue that any further testimony regarding the target rate, including testimony regarding whether or not the stress test is or is not diagnostic, would be excluded pursuant to Evid.R. 702. To this end, appellees argue that any testimony beyond what the target rate is would be expert testimony pursuant to Evid.R. 702 and would be excluded.
{¶55} In our review of Kachline's deposition testimony, we find that the trial court abused its discretion in ruling to limit Kachline's deposition testimony. We find that this testimony at issue does not elicit an expert medical opinion from Kachline; it simply states a rule implemented by the Cleveland Clinic. In other words, what does or does not constitute a diagnostic stress test is a standard set forth by the Cleveland Clinic, and Kachline's deposition testimony regarding this fact is within the confines of her testimony as a Civ.R. 30(B)(5) witness.
{¶56} Thus, to the extent that the trial court limited Kachline's testimony to ReDon's actual performance on the stress test, this was an abuse of discretion. Therefore, we agree with the trial court's ruling that "Kachline cannot testify as to the validity of the diagnostic value of any of the tests." However, articulating that a test below 85% is not diagnostic or a test of 85% is diagnostic is a standard set forth by the Cleveland Clinic and does not speak to the validity of the diagnostic value of the test.
{¶57} Accordingly, appellant's third assignment of error is sustained.
C. Motion to Compel Production of Documents and Motion for Sanctions
{¶58} In appellant's fourth assignment of error, she argues that the trial court erred in failing to grant her motion to compel the production of discovery documents and erred in failing to grant her motion for sanctions.
{¶59} In our review of the record, we note that the trial court did not rule on these motions. More specifically, the trial court's October 13, 2017 journal entry stated appellant's "motion to compel, motion for sanctions and request for an oral hearing * * * is held in abeyance pending compliance with the court's standing orders on discovery disputes[.]" Thus, because the trial court has not ruled upon the merits of the motions, we are unable to review the merits of these particular motions. We therefore remand to the trial court with the instruction of ruling on these motions.
III. Conclusion
{¶60} Based upon our review of the entirety of the record, we find that the trial court abused its discretion in denying appellant's motion for a mistrial. The trial court abused its discretion in limiting Kachline's deposition testimony. We remand with the instruction for the trial court to rule upon the merits of appellant's motion to compel and motion for sanctions.
{¶61} Based on our resolution of appellant's first assignment of error, appellant's *507 second assignment of error arguing that the jury's verdict in favor of appellees was against the manifest weight of the evidence is moot.
{¶62} This cause is reversed and remanded back to the lower court for further proceedings consistent with this opinion.
EILEEN A. GALLAGHER, P.J., and MARY EILEEN KILBANE, A.J., CONCUR

A metric demonstrating whether or not a patient suffered a heart attack.

Any condition brought on by a sudden decrease in or blockage of blood flow to the heart.

See State v. Howard , 42 Ohio St.3d 18, 24, 537 N.E.2d 188 (1989).

Registered Diagnostic Cardiac Sonographer.

The stress test works as follows: a patient, while hooked up to an electrocardiograph machine, runs on a treadmill. The electrocardiograph machine will indicate the patient's heart rate. Once a patient reaches a level of exhaustion, an ultrasound is conducted that measures the amount of oxygen being pumped to the heart.